UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | Case No. 22-60020 |
| INFOW, LLC, *et al.*, | § | |
| | § | Chapter 11 (Subchapter V) |
| Debtors.[1] | § | |
| | § | Jointly Administered |

---

### THE TEXAS LITIGATION PLAINTIFFS' SUPPLEMENTAL MOTION TO DISMISS PETITION

---

THIS MOTION SEEKS AND ORDER THAT MAY ADVERSELY AFFECT YOU. IF YOU OPPOSE THE MOTION, YOU SHOULD IMMEDIATELY CONTACT THE MOVING PARTY TO RESOLVE THE DISPUTE. IF YOU AND THE MOTIVE PARTY CANNOT AGREE, YOU MUST FILE A RESPONSE AND SEND A COPY TO THE MOVING PARTY. YOU MUST FILE AND SERVE YOUR RESPONSE WITHIN 21 DAYS OF THE DATE THIS WAS SERVED ON YOU. YOUR RESPONSE MUST STATE WHY THE MOTION SHOULD NOT BE GRANTED. IF YOU DO NOT FILE A TIMELY RESPONSE, THE RELIEF MAY BE GRANTED WITHOUT FURTHER NOTICE TO YOU. IF YOU OPPOSE THE MOTION AND HAVE NOT REACHED AN AGREEMENT, YOU MUST ATTEND THE HEARING. UNLESS THE PARTIES AGREE OTHERWISE, THE COURT MAY CONSIDER EVIDENCE AT THE HEARING AND MAY DECIDE THE MOTION AT THE HEARING.

REPRESENTED PARTIES SHOULD ACT THROUGH THEIR ATTORNEY.

Creditors Neil Heslin, Scarlett Lewis, Leonard Pozner, Veronique De La Rosa, and Marcel Fontaine (collectively, the "**Texas Litigation Plaintiffs**") hereby: (a) join the *Connecticut Plaintiffs' Emergency Motion to Dismiss Chapter 11 Cases and Objection to Debtor's Designation as Subchapter V Small Vendors* [DE 36] (the "**Connecticut Motion**"); and (b) file their supplemental *Motion to Dismiss Petition* (the "**Motion**"), and respectfully state as follows.

---

[1] The Debtors in these chapter 11 cases along with the last four digits of each Debtor's federal tax identification number are as follows: InfoW, LLC, f/k/a Infowars, LLC (6916), IWHealth, LLC f/k/a Infowars Health, LLC (no EIN), Prison Planet TV, LLC (0005). The address for service to the Debtors is PO Box 1819, Houston, TX 77251-1819.

## INTRODUCTION

1.      "The purpose of the bankruptcy code is to afford the honest but unfortunate debtor a fresh start, not to shield those who abuse the bankruptcy process in order to avoid paying their debts." *In re Nassar*, 216 B.R. 606, 608 (S.D. Tex. 1998). There are no honest debtors here, and there are certainly parties that are attempting to abuse the bankruptcy process.

2.      The Texas Litigation Plaintiffs are plaintiffs in various cases that were previously pending in the district courts of Travis County.  They are victims of Alex Jones and his entities' intentional efforts to spread falsehoods and conspiracy theories while earning millions of dollars from the suffering of others.  On the cusp of finally facing a jury trial on April 25, 2022, Jones reached back into his bag of tricks and litigation tactics in a further effort to avoid facing justice.  He put a plan in motion to file bankruptcy petitions for the three entities he owned that earned no revenues and had little-to-no assets of value to force the victims to the settlement table in a disadvantaged position.

3.      Put simply, there is no legitimate or compelling purpose in continuing these bankruptcy proceedings.  During the limited time this case has been on file, the facts here have demonstrated that the Debtors have no intent to truly "reorganize" their business.  In fact, the Debtors' proposed chief restructuring officer admitted as much when the Court asked him to explain the purpose of this bankruptcy. Schwartz did not say it was to reorganize; he said it was to settle the pending litigation.[2] The Debtors have no actual business to restructure, operations to rehabilitate, no customers to serve, and no real employees.  The bankruptcy is nothing more than a transparent attempt to: (a) evade the impending jury trials and resulting judgments in both Texas and Connecticut;

---

[2] Transcript from April 22, 2022 Hearings, 50:13-20:

**The Court**: . . . What do you believe the purpose of these Chapter 11 cases is?

**Mr. Schwartz**: The purpose? The purpose is to arrange to pay all of the plaintiffs the amount of their—let's say in a bankruptcy sense, their allowed claim in full.  That's the purpose.

and (b) avoid the need for transparency relating to Jones and Free Speech Systems, LLC's ("**FSS**") ability to pay what they rightfully owe to their victims.

4.      This Court should not condone such behavior.  It should reject it by dismissing this case. Courts have long had the authority to dismiss cases that are not filed in good faith.  *E.g., In re Metropolitan Realty Corp.*, 433 F.2d 676, 678 (5th Cir. 1970). And utilizing the bankruptcy process as a mere litigation tactic is bad faith on its face.  This Court should therefore exercise its discretion to dismiss these cases and permit the victims to finally complete the jury trial they have diligently pursued for over four years.

## JURSIDICTION

5.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

## BACKGROUND

6.      Alex Jones, through his media company FSS became a national figure by peddling wild conspiracy theories. Followers tune in to hear him and his guests ramble about unsubstantiated claims—like how the September 11th attacks were an inside job by the U.S government. In December 2012, Jones aimed his conspiracy theories at Sandy Hook Elementary, where a tragic mass-shooting killed twenty children.

### I.      ALEX JONES CLAIMS SANDY HOOK IS A HOAX

7.      For over five years after the shooting, Alex Jones and his media empire engaged in a horrific campaign of cruelty in which Jones denied these children were real—insisting instead that the parents were actors in a massive hoax staged by shadowy elite forces. Jones published over 50 episodes of his show and countless articles pushing his monstrous lie, all while coordinating and funding harassment by a dangerous collection of fanatics.

8.      Suffice to say, the harassment by Jones and his proxies took a toll on the Sandy Hook families, several of whom comprise the Texas Litigation Plaintiffs. Take, for example, Neil Heslin and Scarlett Lewis—parents of six-year-old Jesse Lewis, one of the twenty children murdered. Consumed with despair and facing death threats, Heslin granted a television interview with NBC's Megyn Kelly on June 19, 2017 in a desperate plea to Jones to stop the harassment. Heslin begged the national audience to believe he was a real parent, as he shared with the world that he held his son in his arms with a bullet hole through his head. A week later, Jones retaliated by airing multiple episodes accusing Heslin of being a liar, claiming it was impossible for Heslin to have held his son's body.

## II.    THE TEXAS LITIGATION PLAINTIFFS FILE SUIT.

9.      In 2018, Neil Heslin, Scarlett Lewis, Leonard Pozner, Veronique De La Rosa (the "**Sandy Hook Families**") sued Alex Jones and various entities he owns and/or controls, Debtor InfoW, LLC (f/k/a InfoWars, LLC) ("**InfoWars**"), and nondebtor FSS.  The claims included defamation and intentional infliction of emotional distress, among other claims, and stem from the conspiracy theories Jones and his media outlet disseminated that the mass shooting was a hoax.  Marcel Fontaine's claims arose from falsehoods that Jones and his outfit spread alleging that Fontaine was the shooter responsible for murdering seventeen people at a high school in Parkland, Florida.

10.     Throughout the cases, Jones and his companies routinely evaded discovery and otherwise obstructed progress in the case. Jones made a mockery of the litigation while treating the courts with nothing but contempt. In the Texas litigation, ten of his attorneys have come and gone as Jones has consistently defied court orders and refused to participate in these lawsuits in good faith, all while incurring over $1,300,000 in cumulative sanctions in nearly a dozen orders from the trial court. Jones was also sanctioned for frivolous pleadings by the Texas Court of Appeals and repeatedly sanctioned and held in contempt by the Connecticut Superior Court in a lawsuit brought by other Sandy Hook families. During that time, orders of the various courts have found that Jones has refused

to comply with discovery orders on every successive occasion, produced child pornography in discovery, threatened the lives of plaintiffs' counsel, repeatedly refused to cooperate with depositions, provided false discovery responses, tampered with evidence, submitted a fraudulent affidavit, made frivolous legal arguments, and has continuously introduced chaos and insolence into the proceedings.

11.     Jones's repeated discovery abuses culminated in the trial court granting default judgments for the Sandy Hook Families and against Jones, FSS, and InfoWars on liability in September 2021. The first trial on damages was scheduled to begin Monday, April 25, 2022 (Heslin/Lewis). The remaining cases were set for trial on June 27, 2022 (Pozner/De La Rosa) and August 22, 2022 (Fontaine). The filing of the bankruptcy petition and removal to federal court, however, has precluded the timely liquidation of damages in those matters.

### III.     As the Inevitable Judgments Neared, Jones Doomsday Prepped by Diverting His Assets and Thrusting His Shell Companies Into Bankruptcy.

12.     After the Sandy Hook Families and Fontaine filed their Defamation Cases, Jones started diverting his and FSS's assets. In 2021 alone, FSS transferred tens of millions more than it cost to operate that year. These transfers started just four months after the last appellate-court decision was issued that allowed the defamation cases to proceed. And from 2018 to 2021, Jones personally drew about $18 million from FSS. These draws were in addition to his yearly salary, which exceeded $600,000, and taken while FSS operated at a net loss in the millions each of those years. Jones has since represented that he is insolvent.

13.     And so was FSS, apparently, when Jones drew the $18 million. Just three months after the last appellate-court decision allowing the defamation cases to proceed, a company named PQPR filed a UCC Financing Statement claiming a security interest in essentially everything FSS owns. The claimed security interest covers an alleged $54 million debt FSS owes to PQPR. The supposed debt began accruing years earlier as part of an arrangement where FSS sells PQPR's products on the

InfoWars website. The products include items such as bumper stickers echoing the conspiracy theories on Jones's programming as well as "preparedness" kits like seeds, storable food, survival gear, and nuclear and biological supplies.[3] Under this alleged arrangement, PQPR was to be reimbursed for the costs of the products and receive 70% of the sales revenue while FSS retained the other 30%. In practice, however, FSS supposedly kept 100% of the revenue for about seven years and did not pay for the goods PQPR provided—to the point where a $54 million debt had accumulated. All the while, PQPR not only supplied FSS with more products to sell but also paid FSS millions a year to advertise on the InfoWars website. PQPR still supplies FSS with products to sell and pays for advertising.

14.     As one might expect, this arrangement lasted because PQPR is not actually an independent business. It's an insider of Jones. It is owned and operated directly or indirectly by Jones, his parents, and his children. And the income PQPR receives—including from sources like the Jones Debtors—goes to Alex Jones and these Jones transferees.

15.     And after the defamation cases began, Jones started transferring large sums of money. These sums include money FSS started regularly transferring to PQPR *the same month that the default judgments were rendered*. In fact, the month the default judgments were rendered, FSS started transferring to PQPR between $11,000 per day and $11,000 per week plus 60–80% of FSS's sales revenue—supposedly just to pay the interest on the alleged $54 million debt.

16.     The reality is that these transfers are designed to siphon away Jones's assets to make him and FSS judgment-proof. And on April 6th, 2022, the Texas Litigation Plaintiffs filed an additional suit against Jones, FSS, InfoWars, and other insiders for engaging in fraudulent transfers under the Texas Uniform Fraudulent Transfer Act.

---

[3] *See, e.g.,* InfoWars Store, at "Stickers and Decals", https://www.infowarsstore.com/gear/stickers-and-decals (last visited April 4, 2022); InfoWars Store, at "Preparedness", https://www.infowarsstore.com/preparedness (last visited April 4, 2022).

17.     On April 17, 2022, however, the Debtors filed voluntary petitions for relief under

Chapter 11, Subchapter V, of the Bankruptcy Code. The Petitions were signed by W. Marc Schwartz,

the Debtors' Chief Restructuring Officer.  The *Declaration of W. March Schwartz Regarding Bankruptcy*

*Code § 1161(1) Requirements* (the "**Schwartz Declaration**", attached as **Exhibit 1**) accompanied each

of the Debtors' petitions.  Schwartz met with both (a) a CPA hired to "delve into the books of account

of various entities affiliated with the Debtors"; and (b) Alex Jones and his counsel. Ex. 1, ¶ 7.  After

his investigation, Schwartz came to the following conclusions:

> I have learned that the Debtor's [sic] have no purpose other than to hold assets which
> may be used by other entities. ***They undertake no business activities, they do not***
> ***sell, rent or lease to others anything. Their assets do not generate any income for***
> ***them***. They have no bank accounts and do not pay money to anyone for any reason.
> They have no debt or other liabilities other than those related to pending or potential
> litigation. For these reasons, they have no financial statements or books of account
> and they do not file income tax returns.

Ex. 1, ¶ 8 (emphasis added).

18.     The Debtors seek to have insolvent non-debtors Jones and FSS fund the reduced

payment of the Debtors' unliquidated debts to the Texas and Connecticut Litigants through a

Subchapter V plan that the creditors have no vote in approving or rejecting.

19.     The Sandy Hook Families set for trial on April 25, 2022 nonsuited their claims against

InfoWars because discovery revealed InfoWars had no employees, assets, or business activity, and

doing so would prevent the trial from being stayed.[4] After having been nonsuited, InfoWars filed its

notice of removal even though it was no longer a party in the case.  This improper removal caused

the April 25, 2022 trial to determine damages against Jones and FSS to be postponed. On April 26,

---

[4] *E.g., In re Long*, 564 B.R. 750, (S.D. Ala. 2017) ("Just as a bankruptcy court may lift the stay to permit
an action to proceed to completion in another tribunal, in this district and many others, so may a
plaintiff dismiss a debtor from a lawsuit without violating the automatic stay.") (collecting cases).

2022, Heslin and Lewis each filed their Plaintiff's *Motion for Abstention and Remand* in Adversary No. 22-01023 currently pending in the Western District of Texas.

## ARGUMENT

20.     The Court should dismiss the bankruptcy petitions and allow the Texas Litigation Plaintiffs to proceed to trial against non-debtors Jones and FSS.  The Fifth Circuit has long held that courts have discretion to dismiss cases for cause where the filing was not made in good faith.  *E.g., Little Creek Dev. Co. v. Commonwealth Mortgage Corp.*, 779 F.2d 1068, 1072 (5th Cir. 1986); *In re Metropolitan Realty Corp.*, 433 F.2d 676, 678 (5th Cir. 1970) ("'Good faith' implies an honest intent and genuine desire on the part of the petitioner to use the statutory process to effect a plan of reorganization and not merely as a device to serve some sinister or unworthy purpose.").  The requirement of good faith "prevents abuse of the bankruptcy process by debtors whose overriding motive is to delay creditors without benefitting them in any way or to achieve reprehensible purposes."  *Little Creek Dev. Co.*, 779 F.2d at 1072.  Here, the evidence establishes the lack of good faith needed to continue with these proceedings.

### IV.    THE EVIDENCE ESTABLISHES THE DEBTORS LACK THE INTENT TO REORGANIZE

21.     Any suggestion that the bankruptcy is designed to reorganize the Debtors' business is a charade. Rather, a review of the Schwartz Declaration and the Declaration of Trust establish that the Debtors never conducted any actual prepetition business, and do not intend to in the future:

- After taking a meeting with Jones, Schwartz admits that the Debtors "undertake no business activities" and that they "do not sell, rent or lease to others anything." *Schwartz Declaration*, Ex. 1, ¶ 8. And the Debtors' assets "do not generate any income for them." *Id.*

- The Trustees are not authorized to engage in any trade or business. Declaration of Trust, Art. 3.8.

If the Debtors did not conduct business pre-petition and cannot in the future, there can be no "honest intent and genuine desire . . . to effect a plan of reorganization." *In re Metropolitan Realty Corp.*, 433 F.2d at 678. Clearly, there is another motivation for the bankruptcy.

22.     And Schwartz further confirmed that the primary intent of the bankruptcy is not reorganization at the April 22, 2022 hearing. When the Court inquired as to the purpose of the bankruptcy, Mr. Schwartz responded that it was to "arrange to pay all of the plaintiffs the amount of their—let's say in a bankruptcy sense, their allowed claim in full. That's the purpose." *Transcript from April 22, 2022 Hearings*, 50:13-20 (excerpt attached as **Exhibit 2**). Schwartz's statement makes two things clear: (a) there is no real intent to reorganize; and (b) the alleged payment in full will only be "in a bankruptcy sense." The qualification is telling, as it suggests a deeper motivation for the bankruptcy—avoiding large judgments rendered by juries in the state courts through the bankruptcy process.

## V.    THE BANKRUPTCY IS NOTHING MORE THAN AN IMPERMISSIBLE LITIGATION TACTIC ESTABLISHING THE DEBTORS' BAD FAITH

23.     The petitions represent nothing more than a litigation tactic designed to strip the victims of their right to a jury trial. In the context of determining dismissal for a bad faith filing, "courts regularly consider whether the bankruptcy was intended to obtain tactical advantage in litigation or negotiations." *In re Mirant Corp.*, Case No. 0.-46590, 2005 WL 2148362, at * 8 (Bankr. N.D. Tex. Jan. 26, 2005) (citing *In re Cedar Shore Resort, Inc.*, 235 F.3d 375 (8th Cir. 2000)). An analysis of the timing of events and documents submitted thus far establish that the bankruptcy itself is yet another litigation tactic seeking to eliminate the victims' access to the trial courts.

24.     The timing of petitions' filing and subsequent removals show that the filing was a litigation tactic. After approximately four years of litigation, the first Sandy Hook Family trial was set to begin on April 25, 2022. The Debtors filed their petitions on April 18, 2022 and shortly thereafter, InfoW, LLC filed notices of removal in each case. But InfoW, LLC was not a party to the suit at the

time of the removal, having already been nonsuited from the case earlier that day.[5]  Given that InfoW, LLC was no longer a party to the suit, the apparent reason for the removal was necessarily stopping the trial against Alex Jones and FSS.[6]

25.    The language of the Plan Support Agreement ("**PSA**," attached as **Exhibit 3**) establishes that the bankruptcy and undisclosed plan is an unfair litigation tactic.  The PSA requires the Debtors, along with the Trust, Jones, and FSS to "jointly file and prosecute a motion to establish . . . a Litigation Settlement Trust Claims Estimation protocol. . . ."  Ex. 3, pg. 6, § 3(a). This process requires "the estimation of the Litigation Settlement Trust Claims by the Bankruptcy Court in these Bankruptcy Cases pursuant to Sections 502(c) and 105 of the Bankruptcy Code and Rule 3018 of the Bankruptcy Rules of Procedure." Ex. 3, pg. 5. And the PSA terminates if "[t]he relevant court remands the Litigation Claims and lifts the automatic stay to allow the State Court to proceed to Judgment." Ex. 3, pg. 14, § 8(xiii).  Read together, the clear intent of the bankruptcy is to rob the victims of any ability to have their case resolved by a state court, regardless of the delay that may result.

26.    The requirement that this Court estimate the claims ignores the statutory limitations on claims-estimation procedures for at least three reasons.  First, the plain language of 11 U.S.C. § 502(c) provides that the Court's ability to estimate claims only applies in situations of "undue delay to the administration of the case."  Given that the Heslin/Nelson trial would have already been underway, the cause of any undue delay is the Debtors, Jones, FSS, and this bankruptcy.  The Court should not reward parties with unclean hands by allowing them to benefit from the very delay they caused.  Moreover, had the trial gone forward, it could have served as a test case that would have

---

[5] The filing of a nonsuit extinguishes a case or controversy from the moment it is filed. *Univ. of Tex. Med. Branch at Galveston v. Estate of Blackmon*, 195 S.W.3d 98, 100 (Tex. 2006). The only requirement is the mere filing of the nonsuit with the clerk of the court. *Id.*

[6] In an apparent effort to cure the deficiency, Jones and FSS later joined the removal notice. *Heslin v. Jones*, AP No. 22-01023, at Docket No. 6.

assisted in either the process of estimating the other victim's claims. But the Debtors, Jones, and FSS robbed the Court and all of the victims of this important piece of information. Worse yet, the PSA would handcuff this Court from lifting the stay and remanding the case to determine what a jury would award.[7] *See* Ex. 3, pg. 14, § 8(xiii). Second, 28 U.S.C. § 157(b)(2)(B) limits the Court's authority in determining "the liquidation or estimation" of personal-injury tort claims. This means that, at a minimum, any estimation of claims will require the intervention of the District Court, which will further lead to delay. Third, § 502(c) only provides for mandatory estimation where the associated delay in liquidation is "undue." *E.g., In re Dow Corning Corp.*, 211 B.R. 545, 563 (E.D. Mich. 1997). It is difficult to comprehend how any delay associated with a trial on the merits would be "undue" given: (a) the importance of preserving the victims Seventh Circuit right to a trial by jury, and (b) the fact that the trials were all scheduled to occur by August of 2022.[8]

27.    This Court should not condone such gamesmanship from the Debtors, Jones, and FSS. Had these parties truly been interested in assuring payment in full of all claims, they could have allowed the state court proceedings to advance to trial, determine the total pool of damages suffered by all of the victims, and then filed bankruptcy petitions if the judgement debtors' assets were insufficient to satisfy the judgments. Instead, Jones has orchestrated a bankruptcy proceeding designed to evade facing any jury, minimize damages, and limit any transparency into his finances and wherewithal to pay judgments against him and his companies.

---

[7] "Neither the Code nor the Rules prescribe any method for estimating a claim, and it is therefore committed to the reasonable discretion of the court, . . . which should employ whatever method is best suited to the circumstances of the case." *In re Ralph Lauren Womenswear, Inc.*, 197 B.R. 771, 775 (Bankr. S.D.N.Y. 1996); *see also, In re Continental Airlines*, 981 F.2d 1450, 1461 (5th Cir. 1993) (holding that a bankruptcy court's estimation of an unliquidated claim "may be disturbed on appellate review only in the event of an abuse of discretion."). Here, the best and most efficient way to determine the value of the claims to proceed to trial.

[8] Notably, both the Heslin/Lewis and Pozner/De La Rosa (*i.e.,* the Sandyhook Families) trials would have been completed well within the 120-day period following the Petition Date. The Fontaine trial would have commenced shortly after.

## VI.   The Debtors' Bad Faith is Further Confirmed by Their Seeking Bankruptcy Relief as Subchapter V Debtors.

28.     That this bankruptcy was filed in bad faith is further settled by the Debtors' own bankruptcy petitions, which prove they do not qualify to proceed under Subchapter V. As the Connecticut Motion establishes, the Debtors are not debtors under Subchapter V because they are not "engaged in commercial or business activities."  Indeed, the Debtors' proposed chief restructuring officer, Marc Schwartz, declared under oath that the Debtors do not engage in such activities based on his investigation.  Ex. 1, ¶ 8. And at the first-day hearing, Schwartz doubled-down on this when questioned by the Court. Ex. 2, 50:13-20.

29.     Schwartz's testimony is consistent with what InfoWars has said all along in the defamation cases. For example, InfoWars represented to the state court in pleadings that it does not do anything: "In fact, there will be no evidence that Infowars LLC does anything. Infowars, LLC has no operations, no employees, and no assets, and Infowars LLC and Free Speech Systems have not integrated their resources to 'achieve common business purpose.'"[9] Even InfoWars's corporate representative and current trustee, Rob Dew, could not identify its business purpose:[10]

---

[9] *Defendants' Response to Plaintiff's Motion to Compel and for Sanctions*, Case No. D-1-GN-18-001605, Ex. 4, ¶8.

[10] *Excerpt from Deposition of Rob Dew as Corporate Representative of InfoWars, LLC*, Case No. D-1-GN-18-006623, Ex. 5, at 15:12–22.

```
12        Q.   I'm not trying to trick you.  If you don't

13   know, you don't know.  I'm just trying to figure out

14   what you do know.  Okay.

15             The business purpose of InfoWars, LLC, what is

16   it?

17        A.   I don't know.

18        Q.   Okay.  Why was it created?  By "it," why was

19   InfoWars, LLC, created?

20        A.   I don't know.

21        Q.   How does InfoWars, LLC, make money?

22        A.   I don't know.
```

InfoWars even clarified in an interrogatory response that it "does not generate revenue."[11] In another interrogatory response, it clarified that "Infowars, LLC has no office."[12] And in response to an interrogatory to describe its business purpose, InfoWars responded, "None, other as described in Texas Secretary of State filings."[13] The reality is that the Debtors, especially InfoWars, do not engage commercial or business activities.

30.    This Court recently analyzed what sort of activities make someone a debtor under Subchapter V in its *Steam Energy* opinion. *See In re Port Arthur Steam Energy*, L.P., 629 B.R. 233, 235–39 (Bankr. S.D. Tex. 2021). In doing so, it cited to several factors that showed the debtor there engaged

---

[11] *Defendant InfoWars, LLC's Responses to Plaintiff's Interrogatories, Requests for Admissions, and Requests for Production of Documents*, Case No. D-1-GN-18-006623, Ex. 6, at pg. 2, Interrogatory No. 3.

[12] Ex. 6, at pg. 3, Interrogatory No. 5.

[13] Ex. 6, pg. 2, Interrogatory No. 2.

in business or commercial activities—none of which are present here.[14]  Given that the Connecticut Motion already spotlighted these differences between the debtor in that case and the Debtors here, the Texas Litigation Plaintiffs will not regurgitate that analysis. That analysis, however, settles that the Debtors do not engage in the types of business or commercial activities that trigger the definition of a debtor under Subchapter V.

31.     Perhaps that's why the Debtors resort to rejected caselaw in their motion to massage themselves into debtor status. Citing *In re Wright*, *In re Bonert*, and *In re Blanchard*, the Debtors argue in their briefing that the "majority" view is that the debtor need not be currently engaged in business or commercial activities to be debtors. ECF No. 31, at 8–9. Based on this "majority" view, the Debtors insist that they can qualify as Subchapter V debtors based on the business and commercial activities they engaged in before the bankruptcy filing. ECF No. 31, at 8–9. But this argument fails for two reasons.

32.     First, the actual majority view is that a Subchapter V debtor must be presently engaged in business or commercial activities on the petition date to qualify as a debtor. What the Debtors failed

---

[14] *Compare In re Port Arthur Steam Energy*, L.P., 629 B.R. at 235–39 (citing facts that the company was managed by two principles under a management agreement, litigating a multi-million-dollar lawsuit as a plaintiff, pursuing collection remedies on outstanding account receivables, actively maintaining its facilities and vehicles, actively working on a plan to sell its assets, and filed tax returns as required by state and federal agencies) (citing *In re Johnson*, 2021 WL 825156 (Bankr. N.D. Tex. 2021)) *with* ECF Nos. 1, at 10–11 (showing Debtors undertake no business activities; do not sell, rent, or lease anything; have no bank accounts and do not pay money to anyone for any reason, have no debt or other liabilities besides the pending litigation, and have no financial statements or books and do not file tax returns).

to mention is that most cases have rejected *Wright*, *Bonert*, and *Blanchard*.[15]   And it was for good reason. The holdings in *Wright*, *Bonert*, and *Blanchard* were based solely on an analysis by the treatise, COLLIER ON BANKRUPTCY.[16]   But as the *In re Ikalowych* court noted, the treatise was later revised to remove the very passage relied upon by the Wright court. *In re Ikalowych*, 629 B.R. at 282–83 ("In other words, the treatise authors changed their minds and no longer argue against a temporal restriction as of the Petition Date."). Even setting that about-face aside, this Court has already sided with the true majority in the *Steam Energy* opinion. "The Court agrees with cases holding that 'engaged in' commercial or business activities means a debtor was actively participating in one of these activities on the petition date." *In re Port Arthur Steam Energy, L.P.*, 629 B.R. at 236. Indeed, the Debtors noted this Court's position in their own bench memo. ECF No. 31, at ¶ 16. The Debtors knew when they filed their petition and bench memo that they had to be engaged in commercial or business activities on the petition date to be Subchapter V debtors. Still, they argued that their past activities qualified. Because such activities do not, the Debtors cannot invoke relief under Subchapter V.

---

[15] *See, e.g., In re Blue*, 630 B.R. 179, 189–90 (Bankr. M.D.N.C. 2021) (rejecting the "Wright-Bonert-Blanchard line of cases" and noting that "The majority of recent cases to examine the issue require subchapter V debtors to be presently engaged in business or commercial activities."); *In re McCune*, 635 B.R. 409, 420 (Bankr. D.N.M. 2021) ("While some cases hold that § 1182 does not require a debtor to be engaged in commercial or business activities on the petition date, [t]he majority of recent cases to examine the issue require subchapter V debtors to be presently engaged in business or commercial activities.") (cites and quote omitted); *In re Ikalowych*, 629 B.R. 261, 282 (Bankr. D. Colo. 2021) (rejecting *Wright*. *Bonert*, and *Blanchard* in part because none engaged in a statutory analysis of the plain language and "more persuasive subsequent case law construes the "engaged in" phrase as applying to the circumstances as of the Petition Date"); *In re Thurmon*, 625 B.R. 417, 421 (Bankr. W.D. Mo. 2020) (rejecting *Wright*. *Bonert*, and *Blanchard* and holding that the debtor must be engaged in business or commercial on the petition date); *In re Rickerson*, 636 B.R. 416, 424–25 (Bankr. W.D. Pa. 2021) (rejecting *Wright*. *Bonert*, and *Blanchard* as unpersuasive and agreeing that a Subchapter V debtor must be presently engaged in commercial or business activities).

[16] *See In re Ikalowych*, 629 B.R. 261, 282 (Bankr. D. Colo. 2021) (stating that "the *Wright* court did not actually engage in a statutory interpretation exercise and did not explain its rationale.  Instead, it simply quoted a passage from a bankruptcy treatise . . ." and noting *Bonert* and *Blanchard* "endorsed the *Wright* court's approach without any judicial analysis").

33.     Second, even if past activity sufficed, the Debtors here engaged in no past business or commercial activities. The Debtors flaunt two past activities that, in their view, make them Subchapter V debtors. One of those activities are actions taken to prepare for bankruptcy—like retaining bankruptcy counsel and a CPA firm. Of course, many of these activities only spotlight the Debtors' bad faith. The testimony at the first-day hearing, for example, established that they moved their supposed business from Austin to Victoria in early April—despite swearing that for the past 180 days, they principally operated in Victoria:[17]

**11. Why is the case filed in *this* district?**   Check all that apply:

☒ Debtor has had its domicile, principal place of business, or principal assets in this district for 180 days immediately preceding the date of this petition or for a longer part of such 180 days than in any other district.

ECF Nos. 1, at 3. Even setting aside this wholly inaccurate statement, these types of activities are not business or commercial activities. After all, virtually all petitioners engage in activities to prepare for bankruptcy. If preparing for bankruptcy alone sufficed, then Subchapter V's requirements that the debtor engage in business or commercial activities would be meaningless.

34.     The other past activity the Debtors cite is obtaining and holding intellectual property. But there is no evidence that the Debtors actually own and hold any intellectual property. As the Connecticut Motion notes, the US Patent Office shows that FSS owns the Infowars name—not InfoW. ECF No. 36, at ¶ 27 (citing See https://www.uspto.gov/trademarks/search). This is consistent with what InfoWars represented in state court before petitioning for bankruptcy: "Plaintiff is trying to paint a picture that Infowars LLC handles intellectual properties on the Infowars.com website. This allegation is inaccurate and misleading." Ex. 4, ¶ 11. But even if that were not true, the admissions by InfoWars, in both the litigation and through Schwartz's declaration and testimony,

---

[17] Although the Court may find that the question of domicile ultimately has no legal effect on where the Debtors could file, the misstatement in the petitions is still relevant to the question of good faith.

establish that they were not using the intellectual property to conduct any business or commercial activities.

35.     As the Debtors rightly acknowledged in their briefing, the purpose of Subchapter V is to help small businesses reorganize their liquidated debts so they can swiftly return to business. See ECF No. 31, at ¶ 10. But the Debtors here have no business to return to. As of the petition date, they conducted no commercial or business activities. And none of their debts comprise of the types of liquidated debts a qualifying small business would incur from engaging in commercial and business activities. Simply put, there's no business here to reorganize. That the Debtors nonetheless sought relief under a Subchapter V reorganization plan only evidences that his bankruptcy was filed in bad faith. The Court should dismiss it.

## CONCLUSION

For these reasons, and the reasons set forth in the Connecticut Motion, the Texas Litigation Plaintiffs respectfully request that this Court (a) dismiss the Debtors' cases with prejudice; and (b) grant such other and further relief as the Court deems appropriate.


Dated:  April 27, 2022                          Respectfully submitted,

                                                THE BEATTY LAW FIRM PC

                                                By: /s/ J. Maxwell Beatty
                                                J. Maxwell Beatty
                                                State Bar No. 24051740
                                                max@beattypc.com
                                                1127 Eldridge Pkwy
                                                Suite 300, #383
                                                Houston, Texas 77077
                                                Tel. 832-529-3381
                                                Fax. 832-852-1266

                                                -AND-

McDowell Hetherington LLP

By: */s/ Avi Moshenberg*
Avi Moshenberg
State Bar No. 24083532
avi.moshenberg@mhllp.com
1001 Fannin Street, Suite 2700
Houston, Texas 77002
Tel. 713-337-5580
Fax. 713-337-8850

*Counsel for the Texas Litigation Plaintiffs*

<u>**CERTIFICATE OF SERVICE**</u>

I certify that, on April 27, 2022, a copy of the foregoing motion was served on all parties registered to receive such service via the Court's ECF system.

*/s/ J. Maxwell Beatty*
J. Maxwell Beatty