# Exhibit A

**Transcript from April 22, 2022 Hearing**

```
 1                    UNITED STATES BANKRUPTCY COURT
                       SOUTHERN DISTRICT OF TEXAS
 2                          VICTORIA DIVISION

 3                                    )   CASE NO: 22-60020-CML
                                      )
 4     INFOW, LLC,                    )   Victoria, Texas
                                      )
 5               Debtor.              )   Friday, April 22, 2022
                                      )
 6     ─────────────────────────────  )   9:00 a.m. – 10:49 a.m.
                                      )
 7                                    )   CASE NO: 22-60021-CML
                                      )
 8     IWHEALTH, LLC,                 )
                                      )
 9               Debtor.              )
                                      )
10     ─────────────────────────────  )

11                                  TRIAL

12            BEFORE THE HONORABLE CHRISTOPHER M. LOPEZ
                   UNITED STATES BANKRUPTCY JUDGE
13

14     APPEARANCES:

15     For the Debtors:          KYUNG SHIK LEE
                                 R.J. SHANNON
16                               Parkins Lee & Rubio LLP
                                 Pennzoil Place
17                               700 Milam Street
                                 Suite 1300
18                               Houston, TX 77002

19     For the U.S. Trustee:     JAYSON B. RUFF
                                 HA MINH NGUYEN
20                               Office of the United States Trustee
                                 515 Rusk Street
21                               Suite 3516
                                 Houston, TX 77002
22
       For Proposed Litigation  MATTHEW OKIN
23     Settlement Trustees:      DAVID CURRY
                                 Okin Adams
24                               1113 Vine Street
                                 Suite 240
25                               Houston, TX 77002
```

```
 1   For Neil Heslin et al:   JON MAXWELL BEATTY
                              The Beatty Law Firm PC
 2                            935 Bayou Parkway
                              Houston, TX 77077
 3
                              CLIFFORD HUGH WALSTON
 4                            Walston Bowlin, LLP
                              4299 San Felipe Street
 5                            Suite 300
                              Houston, TX 77027
 6
     Sub Chapter V Trustee:   MELISSA A. HASELDEN
 7                            Haselden Farrow PLLC
                              Pennzoil Place
 8                            700 Milam
                              Suite 1300
 9                            Houston, TX 77002

10   For David Wheeler et al: RYAN E. CHAPPLE
                              Cain & Skarnulis PLLC
11                            303 Colorado Street
                              Suite 2850
12                            Austin, TX 78701

13                            RANDY W. WILLIAMS
                              Byman & Associates PLLC
14                            7924 Broadway
                              Suite 104
15                            Pearland, TX 77581

16                            ALINOR STERLING
                              CHRISTOPHER M. MATTEI
17                            Koskoff Koskoff & Bieder
                              350 Fairfield Avenue
18                            Suite 501
                              Bridgeport, CT 06604
19
     For the Trustee:         RAYMOND WILLIAM BATTAGLIA
20                            Law Offices of Ray Battaglia, PLLC
                              66 Granburg Circle
21                            San Antonio, TX 78218

22   Interested Party:        Shelby A Jordan
                              Jordan & Ortiz, PC
23                            500 N Shoreline
                              Suite 900 N
24                            Corpus Christi, TX 78401

25
```

```
 1    Also Present:            MARC SCHWARTZ, CRO
                               RICHARD SCHMIDT
 2
      Court Reporter/Deputy:   Kimberly Picota
 3
      Transcribed by:          Veritext Legal Solutions
 4                             330 Old Country Road, Suite 300
                               Mineola, NY 11501
 5                             Tel: 800-727-6396

 6

 7
      Proceedings recorded by electronic sound recording;
 8    Transcript produced by transcription service.

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1

 2              VICTORIA, TEXAS; FRIDAY, APRIL 22, 2022 9:00 AM

 3                          (Call to Order)

 4              THE COURT:  Good morning, everyone.  This is Judge

 5    Lopez.  Today is April 22nd.  I'm going to call the nine

 6    a.m. case, which is essentially first-day hearings in InfoW

 7    LLC, IWL -- it should be IWHealth LLC, and Prison Planet TV

 8    LLC.

 9              There are a number of folks on the line, and I'm

10    going to try to keep the line unmuted, just see how that

11    goes.  We have a feature where I can mute the entire line,

12    and I'm going to try to avoid that.  But if I end up doing

13    it, I will give everyone plenty of notice and you will have

14    to hit five-star if you wish to be heard.

15              I'm going to just ask everyone to please put your

16    phone on mute right now until your case is called.  And I

17    hear a lot of back noise.  I'm just going to turn the

18    feature on.  So I'm asking everyone just please take a look

19    at your phone and please keep it on mute.  When it is time

20    to speak, I will call on you and you are able to speak.

21    Let's see how this goes.

22              Let me start off by taking appearances.  And why

23    don't I start in the courtroom.  Who is here on behalf of

24    the Debtors?

25              MR. LEE:  Good morning, Your Honor.  Kyung Lee, K-
```

1    y-u-n-g, L-e-e, on behalf of the three debtors.  And I would

2    like to introduce some of the players on my side that are

3    helping me with this project, the first one being RJ

4    Shannon.

5              Can you stand up, RJ?

6              MR. SHANNON:  Good morning.

7              THE COURT:  Good morning.

8              MR. LEE:  That's my very bright, smart associate.

9    Younger than I am, so he is able to work a lot harder than I

10   am.

11             The second party that's also helping me is Adam

12   Rodriguez, who is my paralegal, who has been working on this

13   case.  As you all know, he (indiscernible) get done by one

14   person (indiscernible) who made a team that worked with me.

15   So those two would be an integral part of the team.

16             And the third party I'd like to introduce today is

17   Mr. Marc Schwartz,.  He's sitting with me at counsel's

18   table.  He is chief restructuring officer of the three

19   debtors, Your Honor.

20             MR. SCHWARTZ:  Good morning.

21             THE COURT:  Okay.  Who wants to go next?

22             MR. RUFF:  Good morning, Your Honor.  Jason Ruff

23   for the U.S. Trustee's office.  And today with me is Ha

24   Nguyen.

25             THE COURT:  Good morning to both of you.  And I

1    think it's the first time I've actually seen you in person

2    as opposed to on the screen.  Good morning.

3              MR. OKIN:  Good morning, Your Honor.  Matthew

4    Okin, O-k-i-n, and David Curry.  We are here on behalf of

5    the proposed litigation settlement trustees, Russell Nelms

6    and Richard Schmidt.  I believe that Mr. Schmidt and Mr.

7    Nelms are on the call.

8              THE COURT:  I see them on video.  And good morning

9    to you, sir.  Good morning to you, Mr. Schmidt and Mr.

10   Nelms.

11             MR. BEATTY:  Yes, Your Honor.  Max Beatty and

12   Cliff Walston.  We are here on behalf of creditors, Heslin,

13   Lewis, De La Rosa, Fontaine, and Pozner.

14             THE COURT:  Good morning.

15             MR. BEATTY:  Good morning.

16             MS. HASELDEN:  Good morning, Your Honor.  Melissa

17   Haselden, Subchapter V Trustee.

18             THE COURT:  Good morning.

19             MR. CHAPPLE:  Good morning, Your Honor.  Ryan

20   Chapple and my colleague, Randy Williams, are here on behalf

21   of what we'll probably refer to as the Connecticut

22   plaintiffs, Mr. David Wheeler, Francine Wheeler, Jacqueline

23   Barden, Mark Barden, Nicole Hockley, Ian Hockley, Jennifer

24   Hensel, Donna Soto, Carly Soto-Parisi, Carlos Soto, Jillian

25   Soto-Marino, William Aldenberg, Richard Cohn, Trustee of the

1    bankruptcy estate of Erica Lafferty, William Sherlock, and

2    Robert Parker.

3           And, Your Honor, I also have the Connecticut

4    Plaintiff's counsel on Zoom.  I would like to introduce them

5    as well.

6           THE COURT:  Sure.

7           MR. CHAPPLE:  Ms. Alinor Sterling and Chris

8    Mattei.  And they will be filing motions of pro hac.  They

9    just...

10          THE COURT:  Okay.  Good morning to both of you.

11   And, Ms. Sterling, if you wish to speak today, if anyone

12   wishes to speak today who has not filed a pro hac, you are

13   free to do so (indiscernible) of today.  Not a problem at

14   all.

15          MS. STERLING:  Thank you for that courtesy, Your

16   Honor.

17          THE COURT:  Okay.  Does anyone else wish to make

18   an appearance in the courtroom?  Okay.  I am hearing some

19   background noise.  So I am going to mute the line.  I have

20   about 70 folks on the line, and it got a little tricky.  So

21   I'm going to -- if you wish to speak, just hit five-star if

22   you wish to make an appearance.  Let me see if there's

23   anyone who wishes to make an appearance.  If you wish to

24   make an appearance, just hit five-star.

25          Okay.  There's an area code 207-650 number.  Do

1    you wish to make an appearance?

2          UNIDENTIFIED SPEAKER:  Good morning, Your Honor.

3    Peter (indiscernible) from (indiscernible) Group.  Thank

4    you, sir.

5          THE COURT:  Good morning.  Does anyone else wish

6    to make an appearance?

7          I've got one more.  I've got an area code 210-601

8    number.  Area code 210-601, do you wish to make an

9    appearance?

10         MR. BATTAGLIA:  Sorry, Your Honor.  I had it on

11   mute.  Too many buttons to push.  Ray Battaglia for Free

12   Speech Systems.

13         THE COURT:  Good morning, Mr. Battaglia.

14         Okay, I think I have an area code 512-710.  Does

15   someone wish to make an appearance from an area code 512-710

16   number?

17         MR. JORDAN:  Your Honor, Shelby Jordan.  I am

18   making appearance on behalf of Alex Jones.

19         THE COURT:  Okay.  Good morning, Mr. Jordan.

20         MR. JORDAN:  Good morning.

21         THE COURT:  Okay.  Mr. Lee -- for the folks who

22   have made an appearance, I have left your line unmuted.  I'm

23   going to ask that you just keep your phone on mute just

24   during this time.  And if you with to make -- wish to speak,

25   just let me know.  Okay, I believe I have covered everyone

1   who wishes to make an appearance.  So, Mr. Lee, let me turn

2   things over to you, sir.

3            MR. LEE:  May it please the Court, Your Honor.

4   Kyung Lee, for the record, for the three debtors.  I want to

5   take out some administrative matters before we head to the

6   substantive matters for the Court.

7            THE COURT:  Okay.

8            MR. LEE:  Number one, Docket 8 had a joint

9   administration motion that was set for today, and I believe

10  Your Honor has already signed that order.  So that is going

11  to be moot for today's hearing.

12           THE COURT:  Yes, I did sign it.

13           MR. LEE:  Thank you, Your Honor.

14           Number two, I believe in the Subchapter 5 cases,

15  that it would be your desire to sign these Subchapter 5

16  deadlines order today.  And we have a form of order which

17  sets the status conference for an 1188 conference as well as

18  the status report under 1188(c) and a deadline to file a

19  Chapter 11 plan under 1188.  So we have a form of order for

20  that if you want to consider that at the end of the hearing,

21  or whenever you think --

22           THE COURT:  I think -- I don't know who can answer

23  that question.  But if we pick a date, I need to know

24  whether we're going to have a case or not.  But I'm not sure

25  that you can answer that question.

```
1              MR. LEE:  That would be a question for --

2              (Break in audio)

3              THE COURT:  Yeah.  It's really a question for the

4    third party contributors because they are the ones who have

5    the right to terminate it.  But one of the concerns that I

6    have -- and maybe this is just something -- again, all I

7    know is we're not going to write on the papers.  Right?  So

8    I'm just raising some concern to something that maybe

9    somebody can answer very quickly for me, is the third-party

10   contributors essentially fund these Chapter 11 cases.  I

11   don't see any sources of revenue.  As I read the trust

12   agreement, the Debtors are not actually allowed to engage in

13   any business activity, so they can't generate funds.  So if

14   the third party contributors decide to pull the plug and not

15   fund this at any point, you know, maybe a ruling that I make

16   or just decide they don't want to go forward with it any

17   more, you know, the lifeblood of these Chapter 11 cases goes

18   away.  And I think I need to understand whether we have

19   cases or not.  Because, you know, sometimes the judge rules

20   in favor of one way, sometimes the judge rules in another

21   way.  And I need to know kind of whether they are really

22   committed to these cases.  You know, any (indiscernible)

23   Subchapter IV trustee doing her work and doing her --

24   fulfilling her statutory duties in a Subchapter V case.

25              And I'm not indicating one way or the other that I
```

1    believe that the third-party contributors are not serious

2    about funding these cases.  Obviously they took the time and

3    did it.  I'm just raising -- parties really want to go

4    forward with a Chapter 11 case, right?  There has to be some

5    stream of guaranteed source of funds, and it can't be tied

6    to dates that I haven't approved or decisions that I have

7    not yet to even consider based on motions that have yet to

8    be filed.  You know, it's just not -- it's a hypothetical

9    world.  But I just need to understand that.

10           But maybe all that could be answered.  We're not

11   really going forward today.  I'm just -- it's one of the

12   things that makes me think about the trust.  And as I think

13   about the trustees -- if you're here, Mr. Okin.

14           Mr. Nelms and Mr. Schmidt, this is -- they're

15   certainly qualified.  Put that aside.  The question is who

16   is working on behalf of -- I'm just thinking at the 10,000-

17   foot level.  Right?  Who works for the estate, right?  If

18   the settlement trust fees are bound by the settlement trust

19   and must only work within the confines of the trust -- and I

20   know that the trust is still yet to be negotiated.  But

21   whatever it lands on, then who does the work of the estate,

22   right?  If they're trustees of a trust, then by approving

23   the trustees and then approving them to do the work

24   according to the trust.  So it's almost like an implied

25   approval of the work done under the trust.  But then who

1    represents the estate?  That's the question that ultimately

2    somebody is going to have to answer.  Who does the work of

3    the estate?  Who is acting on behalf of solely the interest

4    of the estate?  I get it, Mr. Schwartz is operating as a

5    327, but the proposed order that was -- someone was going to

6    ask me to sign today was going to say that Mr. Schmidt and

7    Mr. Nelms could fire them without my approval.  Maybe

8    somebody should think about that as they think about the

9    10,000-foot level.  There has to be a 327.  327 means that

10   they are fiduciaries of the estate, which means that the

11   court would have some supervision or they would answer on

12   behalf of the estate or be fiduciaries of the estate.  I

13   just want to make sure that there is someone who is going to

14   take a position, and sometimes they're hard positions, on

15   behalf of the estate.

16          And I'm not saying these questions can't be

17   answered, I'm just -- again, (indiscernible) order on

18   papers, and they raised questions.  And I didn't want to

19   blindside anyone with any of these questions that I had.  So

20   I don't want to start making comments on a trust agreement

21   that you're telling me is going to get negotiated.  We'll

22   have to wait and see what's finally there.

23          MR. OKIN:  We are certainly happy to have your

24   comments in advance so we can address them.  But we will --

25   these are issues we are wrestling with, including not making

1    sure the funding is available --

2           THE COURT:  Because the money comes in, but the

3    money is not -- the way the trust is set up, the third party

4    contributors contribute to the trust, but it doesn't become

5    property of the estate because it stays within the trust,

6    and then the trustees fund in accordance with --

7           MR. LEE:  The plan.

8           THE COURT:  Right?  So that becomes interesting.

9    And so if -- yeah, let's just say a payment in full --

10   payment in full is defined under 10.1(c).  Maybe that number

11   is different than what other people may have expected.  Is

12   it property -- it's not property of the estate.  And so I

13   would be allowing a claim that would never be paid.  It's

14   the things that I think about.

15          And again, this has zero to do with Mr. Schmidt or

16   Mr. Nelms.  That's not -- I just think about on behalf of

17   the estate and the Debtors that have to get administered

18   here.  I should probably stay quiet and just allow Mr.

19   Schwartz to just answer.  But I'm saying this for the

20   benefit of Mr. Lee, who is going to put Mr. Schwartz on.

21   Today is a day for information as I understand it.  And so I

22   think I want to kind of express some of the thoughts that I

23   had as I read the papers and give everyone an opportunity to

24   react to it.  Because I'm going to ask Mr. Schwartz these

25   questions.  And so I suspect -- I don't want to surprise Mr.

Page 14

1   Schwartz by the way I'm reading and understanding the trust
2   agreement.  Because if I've got something wrong, I want
3   somebody to tell me.
4           MR. OKIN:  Your Honor, I don't think you do on the
5   current documents.  And that's part of what we are working
6   on.  I did just want to leave the Court with -- both Mr.
7   Schmidt and Mr. Nelms have raised a lot of these same
8   issues.  They think they can be a help to this process.
9   They come at this completely neutral.  They think that if
10  people give them a chance and give this process a chance.
11          They've spent their whole lives, their
12  professional careers at least, in the bankruptcy system.
13  They believe in it.  They think that more often than not, it
14  is a fair and equitable process for dividing up scarce
15  resources and that if given an opportunity, they can
16  actually give some people some peace and an opportunity to
17  resolve these issues.  And they think that given enough time
18  and the opportunity to do it, that they can help bring that
19  about.
20          THE COURT:  Okay.  Thank you very much.
21          MR. RUFF:  Good morning, Your Honor.
22          THE COURT:  Good morning.
23          MR. RUFF:  Jason Ruff for the U.S. Trustee's
24  Office.
25          Your Honor raises a number of great questions.

1    And quite frankly, this case begs those questions as it has

2    been set forth before the Court.

3         I would like to just say at the outset too, our

4    opposition has nothing to do with the individuals that are

5    proposed to be the trustees, Your Honor.  Our position is

6    threefold.  And first of all, there's no emergency, so

7    that's off today.  I think everybody recognizes there is no

8    emergency.  But to Your Honor's questions that Your Honor

9    was just asking and what has been proposed here today, this

10   form with this litigation settlement trust, it's called a

11   litigation settlement trust.  It seems to operate more than

12   that, thought.  It seems to operate more like an LLC

13   operating agreement and that the trustees, as was proposed,

14   were to be managers of the LLC, have management authority of

15   the LLC, and with Mr. Schwartz reporting to them

16   essentially, that his duties would run to them.  And there

17   is an inherent conflict there.

18        But Your Honor, 105, which is the authority that

19   they cite for seeking that, your Court blessed that, doesn't

20   extend that far.  The bankruptcy code is clear about when a

21   court can enter orders appointing individuals, examiners and

22   trustees under 1104.  And were Congress is provided a power

23   in one place but not another, Section 105 cannot be used to

24   give the court more powers.

25        And one other thing, Your Honor, is that we found

1    very problematic and was set forth of course in our

2    pleading.  But the motion asks for the Court to bless

3    certain liability protections that are wholly unnecessary

4    for the Court to do.  The trust stands on its own.  It's an

5    agreement that the trustees are being asked to sign that was

6    orchestrated and put into place by Alex Jones and Free

7    Speech Systems.  And, Your Honor, it can determine what

8    their -- if they're going to agree to that, they can agree

9    to that.  They don't need the Court to do that.  The

10   agreement was entered before it ever even -- these cases

11   were filed, Your Honor, before they ever came to court.

12          So it is our position that not only does the Court

13   not have authority to do it, but under the Code at least

14   Your Honor -- it is not necessary, either.

15          THE COURT:  Mr. Ruff, in terms of the timing

16   question if we don't go forward on the CRO motion and on the

17   trustee motion, do you have a sense of timing?

18          MR. RUFF:  Your Honor, I think we can use at least

19   21 days from the date that they were originally proposed.  I

20   don't see what emergency there is.  Mr. Schwartz has already

21   exercised authority on behalf of the Debtors by signing

22   these petitions.

23          THE COURT:  The only question that came to my mind

24   on -- you know, and maybe Mr. Schwartz will answer the

25   question -- is somebody needs to work on schedules and, you

1    know, the bread and butter bankruptcy materials and start to

2    answer questions, and Ms. Haselden has questions or the

3    trustee has basic questions.  I doubt that there's any bank

4    accounts or any -- your know, or anything.  I just want to

5    make sure that there's -- but I guess Mr. Lee has given me

6    some comfort that they're there.  It's the only one that

7    makes me think, you know, should we have someone -- but

8    maybe Mr. Schwartz is going to tell me that he can do that

9    work.  And if he can do that work, then I'm okay with the

10   timing on that.

11         MR. RUFF:  Your Honor, my response to that, to

12   your question would be simply this.  Your Honor, these

13   individuals were put into place.  Take a step back.  These

14   companies were -- these entities were 100 percent wholly

15   owned and controlled by Alex Jones prior to the trust being

16   put into place.  And they were given authority pursuant to

17   those documents, pursuant to things that were done in

18   advance of the bankruptcy case.

19         Your Honor, the court wasn't necessary for them to

20   have authority at that point.  I don't see that it's

21   necessary for them to have authority now as a 327

22   professional if that's what they're going to seek for the

23   CRO's employment under.  That has more to do with their

24   ability to be -- not only to act on behalf of the Debtors,

25   but also to be compensated and the duties that they're going

1   to run under the Code.

2          But every professional that comes in prior to a

3   bankruptcy case still has duties and still has an obligation

4   to act.  If it all blows up, Your Honor, if there is no case

5   here, if Mr. Jones decides that he doesn't want to fund,

6   then that's really on Mr. Jones.  These companies don't

7   operate, they don't have employees.  This is not a situation

8   where if, for lack of a better word, these cases crater,

9   that we are going to see employees of these companies suffer

10  and be without a job and without a source of income.

11  There's not trade creditors out there or other parties who

12  are not going to receive goods and services.

13          Your Honor, the only person here who might be

14  harmed is Alex Jones.  And because these cases appear to be

15  -- at least it's questionable to why we're even here.  But

16  they appear to be orchestrated by him to limit his liability

17  and the liability of Free Speech Systems.  So I don't even

18  know that it really even matters.  It's to his benefit.  He

19  wants these cases to go, then he can decide to fund these

20  cases.  If he doesn't want them to go, to try and do

21  whatever it is that he's trying to do, then he can pull the

22  purse strings and back off and these cases can be dismissed,

23  which perhaps they should.

24          THE COURT:  Thank you.

25          MR. BEATTY:  Your Honor, if I may.  I represent a

1   group of creditors who I am going refer to as the Texas

2   Claimants.

3          THE COURT:  Okay.

4          MR. BEATTY:  And these are the cases that

5   ultimately -- one of which was scheduled to start on Monday.

6   This bankruptcy halted that process and slowed down

7   ultimately the liquidation of damages not only against the

8   Debtors -- I think that's relatively minor.  We can see

9   within the context of what's already been filed that these

10  Debtors don't really operate a business.  The bankruptcy

11  itself was filed to protect Alex Jones and to protect Free

12  Speech from having to face trial on Monday.

13         And I think Your Honor has looked at and seen some

14  of the issues that we identified initially.  But I think

15  there's a lot more than that.  And I think that we have

16  gateway and threshold issues that have to be answered before

17  anyone should go forward in deciding who is a trustee of a

18  trust that apparently has holes in the documents and will

19  need to be changed and who is going to be appointed to run

20  these, and so on and so forth.

21         So just as a preliminary issue, I have some

22  problem with saying that we're going to hear that in 20 more

23  days.  Because I think this Court is going to need to decide

24  the propriety of this bankruptcy well in advance of that.

25  There are a lot of attorneys in this room right now.

Page 20

1    There's a lot of billing that's going on that to me may be

2    wholly unnecessary.  And all it's doing is causing delay.

3            And, Your Honor, I think one of the things we have

4    to decide right off the bat, is this case subject to

5    dismissal, is it subject to conversion, should it be a

6    Subchapter V even?  Those questions have to be answered

7    before we spend that extra money.  And what we've already

8    seen in the PSA, that plan support agreement, is if you did

9    any of those things, that plan support agreement is dead.

10   If this isn't a Subchapter V, dead.  Dismissed, dead.

11   Converted to a seven, dead.  There is no intent on funding

12   unless they can effectively force third-party releases into

13   a bankruptcy plan.  That's not permitted in the Fifth

14   Circuit.  This is a near (indiscernible) opportunity for

15   them.  They are trying to get a release for Alex Jones and

16   for Free Speech.  And they are attempting to do it without

17   the transparency that's inherent to a bankruptcy process.

18   Because when you look at those agreements, certainly the

19   trustees have some opportunity to look at budgets for Free

20   Speech, for Mr. Jones.  But when you look at the agreement,

21   at best, there's a weak, toothless oversight board who

22   doesn't necessarily have any right to look at any of these

23   confidential documents.  So I think the threshold question

24   for this Court before we move forward, before we do anything

25   else, is whether or not this case should be dismissed.

1          The Fifth Circuit says that good faith implies an

2     honest intent and genuine desire on the part of the

3     petitioner to use the statutory process to effect a plan of

4     reorganization and not merely as a device to serve some

5     sinister or unworthy purpose.

6          And let me tell you, I think we've got a sinister

7     and unworthy purpose here.  I don't think -- and even if I

8     am wrong on that, we don't have an actual intent to

9     reorganize here.  And I say that because you can look at the

10    Schwartz declaration which was filed with every single one

11    of the petitions.

12         And I want to read a paragraph.  It's Paragraph 8.

13    "I have learned that the Debtors have no purpose other than

14    to hold assets which may be used by other entities.  They

15    undertake no business activities.  They do not sell, rent,

16    or lease to others anything.  Their assets do not generate

17    any income for them.  They have no bank accounts and cannot

18    pay money to anyone for any reason.  They have no debt other

19    than liabilities, other than those related to pending or

20    potential litigation.  For these reasons, they have no

21    financial statements or books of account, and they do not

22    file income tax returns."

23         I don't know what we are trying to reorganize

24    here.  We're not setting up a business to contain them in

25    the future, we're channeling settlements and forcing it down

1    Plaintiff's throats.  They want to use a claim estimation

2    procedure, and it's transparent why that needs to occur to

3    them, because they want to face the state court.  We can all

4    say we have disagreements about what the value of those

5    claims are worth.  I am certain if you ask the Defense

6    attorneys from the state court litigations, they would tell

7    you none of the claims are worth much.

8         But even without ever talking to any of the

9    plaintiffs, you see an agreement that suggests there is

10   going to be $2 million put in and a stream of income worth

11   another five.  So at a minimum before we can even negotiate

12   with them, they're telling this Court $7 million in

13   liability.  And the claims estimation procedure, I don't

14   think that -- that's not a process where we have a lot of

15   different claims that will take forever to decide.

16        Again, two of my clients' claims would have been

17   decided.  The dollar amount would have been done.  The other

18   claims are all set for trial in state court.  But there's

19   just a series of poison pills in the trust agreement and the

20   PSA.  If you lift a stay, that -- no more payments.  No more

21   payments from Jones.  If there is a remand, no payments.  On

22   and on and on.  Conversion, dismissal, anything.  It's all

23   dead.

24        This is a situation where the first question for

25   this Court is is this proper.  And I don't want to see all

1   the parties here continuing to spend money on what I think

2   is tertiary before that actual question gest answered.

3              And, Your Honor, the simple issue is that you can

4   look at it and see that it will fail just based on the

5   question of whether or not they are a Sub V debtor.  You

6   know?  To be a Sub V debtor, you have to be a person engaged

7   in commercial or business activities.  Mr. Schwartz has

8   already told us neither of those items are true.  They don't

9   accept money, they don't get paid.  They don't pay anything.

10  They don't operate.

11             So if Sub V is inappropriate, the PSA is down.

12  There is no money.  These are the things we need to look at

13  first, Your Honor.  I don't think we need to make any other

14  decisions.

15             MR. WILLIAMS:  Thank you.  Your Honor, Randy

16  Williams for David Wheeler --

17             THE COURT:  Good morning.  Just get to a mic.  I

18  just want to make sure they can hear you on the...

19             MR. WILLIAMS:  Sorry, Your Honor.

20             THE COURT:  No worries.  Good morning.

21             MR. WILLIAMS:  David Wheeler and the other

22  Connecticut plaintiffs.

23             I think Mr. Beatty has very eloquently and

24  concisely laid out the similar concerns that our clients

25  have and that the fundamental issue here is in light of Mr.

1    Schwartz's declaration, what are we doing here?  And, Your

2    Honor, I will for the record object to Mr. Schwartz giving

3    any further testimony beyond what he has already declared in

4    that declaration today.  Because what have we learned so far

5    today?  That we want to get trustees approved for a trust

6    that the trustees don't even agree to what it's going to

7    look like or say.  And we don't know when we're going to get

8    it or when we're going to have it.  And we're talking about

9    setting hearings and how long we can go, but we don't know

10   when they're going to get a trust agreement that they're

11   happy with or when we're going to be able to see it.

12          And no clock should start ticking and no deadline

13   should run on us until they come forward and give notice of

14   what it is that they want to do.  You've got a PSA we've

15   talked about.  It's not a PSA, Your Honor.  It was

16   negotiated between Alex Jones and himself.  Who stood up on

17   the other side for anybody?  Because again, look at Mr.

18   Schwartz's declaration to these petitions.  These entities

19   don't qualify for Subchapter V.  They don't even qualify to

20   be in the Chapter 11.  This has all been done for the

21   benefit of Alex Jones and Free Speech.

22          And let's talk about that for a minute.  Your

23   Honor, these cases that were being litigated in Texas and

24   Connecticut have been going on for years.  And in the course

25   of those cases, these Debtors, Mr. Jones and Free Speech,

1   have all suffered death penalty sanctions because of their

2   conduct before those courts.  They removed the Connecticut

3   cases, they removed the Texas cases back to (indiscernible)

4   court.  That's not the first time that's happened.  In

5   Connecticut I know it's happened at least twice, and twice

6   they've been sent back.  We've already filed an emergency

7   motion in Connecticut to remand that case, and the

8   Connecticut judge has said that the trial date as to Mr.

9   Jones and Free Speech in September of this year that's

10  already been set and was already pending, as soon as she

11  gets the case back is going to stick.  And again, if they

12  wanted to estimate these claims and know what the real

13  liability was and they've really spent $10 million in legal

14  fees that ended up in them having their pleadings struck and

15  death penalty sanctions, then why didn't they go to court on

16  Monday and see what happened in that case?  Because that

17  would have laid a groundwork that would have then led to

18  something in the way of putting together a plan.

19          Your Honor, being on the bench, you have a lot of

20  experience with Chapter 11 cases I know in your practice.

21  And you know that if there's a real desire to put together a

22  plan and bring people together and forge a settlement

23  between Claimants and Debtors, that there's some negotiation

24  that goes on with someone pre-petition.  And here, it's

25  nonexistent.  They came up with all of this on their own.

1            Actually, Mr. Jones did it.  And he's put $750,000

2    into the trust that's already -- you ask about Mr. Schwartz.

3    And based on what I read, Your Honor, Mr. Schwartz has

4    already exhausted over $30,000 of his $50,000 retainer that

5    he got.  He filed these cases.  And if his declaration,

6    which I accept as true, then Your Honor, filing schedules

7    and statements in these cases with no bank accounts, no tax

8    returns, no income, no expenses, has got to be a pretty easy

9    process.

10           But mostly I want to get back to we've got to get

11   to the fundamental issue here.  We've had somebody who,

12   because of his behavior and the behavior of the entities

13   that he owned and controlled and ongoing litigations in

14   multiple courts in Texas and Connecticut face death penalty

15   sanctions.  And Connecticut, those death penalty sanctions

16   were appealed and he lost.  And they were upheld.  That's

17   how bad the conduct has been.  And now we're in another

18   court here trying to do a Subchapter V where you don't get a

19   Committee and have a say.  Only the Debtor can file a plan.

20   Your Honor, this just isn't right.

21           One of the colleagues from Connecticut in our

22   initial meeting with us said this process is illegitimate.

23   And at the time, I was thinking that's a really strong word.

24   And then I slept on it.  And I told Mr. Chapple, I said,

25   well, I've got to apologize to her because she's absolutely

```
1    right.  This is illegitimate.  And before this Court begins

2    taking steps to move things forward or treat things as

3    first-day hearings, the Court needs to look at whether or

4    not this is proper and appropriate, and we need to be taking

5    all those other steps.

6           Again, we don't even have a trust agreement.

7    That's the first thing we get told today is when -- and I

8    didn't hear Mr. Lee say it.  He said he didn't want to go

9    forward with it.  But it was counsel for these proposed

10   trustees, said, well, we don't have a trust agreement.  So

11   what are we going to have?  And why are we talking about

12   what it might be when -- why aren't we looking at the issue

13   again of why we're here?

14          And another thing, Your Honor, that's troubling to

15   my clients -- and with all due respect to the Court, why are

16   we in Victoria?  We've pulled the records on these three

17   entities from the Secretary of State up through November of

18   last year.  Every information report that's been filed,

19   every document that's been filed on these entities says that

20   they're domiciled, their assets and their principal place of

21   business was a PO box in Austin, Texas.  So why do these

22   cases get filed in Victoria?  And if Mr. Schwartz's

23   declaration is true, then how do we get to Victoria if we

24   don't have any employees, if we don't have any business

25   until the last umpteen years that these companies have been
```

1   in business with always saying we were in Austin -- or not

2   in business, that they were in existence.  I apologize, Your

3   Honor.

4          So again, we do intend to file an emergency motion

5   to dismiss because we want dismissal considered before we

6   move forward with any of this first-day issues or having

7   anyone talk about -- I don't know what information Mr.

8   Schwartz can give us beyond his declaration.  And again, I

9   don't -- we are very concerned that to the extent the Court

10  comments on and takes testimony in this case, it begins to

11  legitimize the process.  But again, I agree with my

12  Connecticut counsel, I will --

13         THE COURT:  Let me just tell you though, today was

14  the first day and there were two motions set.  And I read

15  objections that were filed to them, and no one is going

16  forward today on anything.

17         I'm giving comments based upon things that I

18  thought about when I read the overall case, read the

19  documents.  I don't think anyone should read anything other

20  than that.  I had two m options in front of me, and I found

21  out they're not going forward today.  If someone files

22  another motion, I'll take that up and consider it.

23         So if people want me to consider something, then

24  they'll file something and I will consider it.  And it

25  sounds like you are.  And when that's filed, I'll consider

1    it.  But right now, I have two motions and I'm trying to

2    find out -- the Debtor has filed two motions and then asked

3    for consideration of them.  I've got a duty to think about

4    the timing of those questions, and I'm raising other

5    questions.  And if somebody files something, then we'll take

6    that up.  But somebody has to file something for me to

7    consider it.

8          MR. WILLIAMS:  Both of those motions are premised

9    on a trust document that you've now been told the two

10   trustees that you were asked to appoint, don't approve of

11   them.  So again --

12         THE COURT:  That's why I'm asking the question.

13   I'm telling you --

14         MR. WILLIAMS:  But we don't have notice of what

15   it's going to be or what we're going to do.  (indiscernible)

16   set something --

17         THE COURT:  I agree with you.

18         MR. WILLIAMS:  We don't know what it's going to

19   be.

20         THE COURT:  That's why I'm asking questions about

21   timing and what that looks like.  I don't know.  But I think

22   Mr. Lee is going to have to give me an answer to that

23   question.  And I agree with you.  We can't set a hearing

24   until there's a document that everyone can look at.  Not

25   just me, but other parties and have an opportunity to review

1  and observe, and Subchapter V trustee, your client.  I don't

2  know what that timing looks like.

3          So I don't know whether 20 days, 60 days makes

4  sense.  I think they're going to have to tell us when that

5  document stops moving, and then we can set a date.  And if

6  there are other motions that are filed before then, then

7  I'll consider those motions as well.

8          We just have to run a transparent -- and a process

9  that's based upon -- and I'm not saying you're saying

10  anything different.  But you need to run a process where

11  there's transparency and there's due process afforded to all

12  parties.  And I'm not going to jam anyone on an emergency

13  motion based on a document that someone has seen 24 hours in

14  advance.  I'm not doing that.  So let's just -- I think Mr.

15  Lee is going to have to -- and maybe with the input of Mr.

16  Okin.  And maybe that's not today.  But I don't think -- and

17  maybe it's just continued to a date to be determined.  But I

18  think on the CRO motion, they need to -- someone needs to

19  tell me when they want to come back.  And on the trust

20  document, I think we're going to have to find out.  And if

21  there's another motion or something else that gets filed,

22  we'll take that up in due course.

23          And I don't think I'm -- I'm not disagreeing with

24  anything of what you're saying.  I'm just highlighting for

25  the parties in the room and for those who may be listening

1   that, you know, we're going to run a process based on the

2   federal rules of bankruptcy procedure.  We're going to

3   follow the Bankruptcy Code, and we're going to follow due

4   process to all parties in interest.

5        So I don't -- you know, I'm commenting on

6   documents that were in a motion that was before me.  That's

7   it.  I don't think anybody should read one way -- I'm not

8   legitimizing or delegitimatizing anything.  I think I've

9   probably asked more questions than Mr. Lee probably wanted

10  me to ask.

11       I'm just kidding.  I'm just kidding, Mr. Lee.

12       MR. WILLIAMS:  Respectfully, Your Honor, with

13  regard to asking Mr. Lee or Mr. Okin, it's Mr. Battaglia or

14  Mr. Jordan, whom I'm glad announced today whom they were

15  representing, since when they filed their notices of

16  appearance, they chose not to identify their clients in

17  those documents.  I did see in the attachment to the trust

18  document for the budget that they had gotten retainers to

19  represent Mr. Jones.

20       It's interesting that a trust that's supposed to

21  be for the benefit of injured parties -- and again,

22  liability has already been established.  That's not an issue

23  here.  The only issue is the dollar amount of that.  And

24  again, if you really wanted to have that decided, you could

25  have good clues starting next Monday, but Mr. Jones chose

1    not to do that.  He created this bizarre system that we see

2    here, which we still don't know what it is.  But it's not

3    the Debtor or the trustees, who are not actually trustees,

4    who can answer your questions.  It's Mr. Jones and Free

5    Speech.  Because as Your Honor has pointed out, they're the

6    ones who are using their money, and they want releases for

7    that, as Mr. Beatty has pointed out.  But they don't want to

8    come into this Court.  They don't even want to have their

9    lawyers file notice of appearance that identify who they are

10   appearing on behalf of.  They want the benefit of bankruptcy

11   without being in bankruptcy.  We'd be having a whole other

12   discussion at be at a whole other position today, Mr. Beatty

13   and I, and Mr. Jones and Free Speech for part of it.  But

14   the truth is, they're not.  They're staying outside of it.

15   And that's not right.  They shouldn't be -- they're getting

16   the advantage of the stay of these debtors to keep that case

17   from going forward on Monday, and they paid $750,000 of all

18   these professionals, plus some folks on the screen there, to

19   get them to make that happen.  And our folks are just

20   waiting to liquidate their claims, claims that need to be

21   liquidated in state court that shouldn't be liquidated as

22   part of a bankruptcy because the Court's jurisdiction, if it

23   did have jurisdiction, would be tenuous at best.

24         But again, Your Honor, I don't have anything else

25   to add at this time.  I appreciate that we are not going

1    forward today.  We had only filed an emergency motion to

2    continue.  We do intend to object -- well, we intended to

3    object to the motions as filed.  Since they're going to

4    change, we don't know what we're going to do to those.  But

5    we will be filing an emergency motion to dismiss these cases

6    on the grounds that Mr. Beatty has raised and I echoed

7    today.

8                THE COURT:  Okay.  Thank you.

9                MR. BATTAGLIA:  Your Honor, may I briefly be

10   heard?  This is Ray Battaglia.

11               THE COURT:  Yes.  You've identified yourself.

12   There's a lot of boxes, so I appreciate you saying that.

13               MR. BATTAGLIA:  I'm not going to address all of

14   the things that are before the Court, but there are a couple

15   questions that were raised, and much has been said about, I

16   don't know, maybe some (indiscernible) responsive how my

17   appearance was entered and how this trust agreement is not a

18   final document.

19               And I think the Court should appreciate that the

20   trust agreement was negotiated somewhat in the blind.

21   That's not to suggest that Mr. Lee did not act on behalf of

22   his clients in reviewing it.  But at the end of the day,

23   parties who need the most input are the trustees.  And the

24   interim trustee has literally no power under this document,

25   as appropriate.  So the appointment of the trustees is a

1    very important step in getting that document to final.

2            I don't think Mr. Okin -- and he can comment on

3    this.  I don't think we're talking about a wholesale rewrite

4    of this document.  I think there are issues that he brought

5    up this week to us that we were expecting, a first turn of

6    the document.  And of course the third-party funders are

7    amenable to reasonable modifications to that document.  But

8    I think that the suggestion that somehow there is something

9    nefarious about this being less than a complete document is

10   absurd.  We negotiated as best we could a document that

11   serves the purpose of trying to pay allowed claims in full.

12   And the other thing I think that's missing here is that

13   should the case have gone to trial in Austin, there's a

14   significant likelihood that there would be no money for

15   anybody.  And that's the intent here, is to try to preserve

16   a means to pay allowed claims.  And that's what this system

17   is set up to do.  I could dispute a lot of other things, but

18   I think those are the most important thing.

19           I think, Judge, your comment about April 30th, of

20   course we're not going to hold an  April 30th deadline, but

21   we do need this to move forward with some speed so that we

22   know that we've got people we can talk to on the other side

23   to get these documents into final shape.

24           THE COURT:  Okay, thank you.  Anyone else wish to

25   address the Court at this time?  Is there anyone on the line

1   who wishes to address the Court?  Hit five-star.  Okay.

2        MR. LEE:  Good morning, Your Honor.  For the

3   record, Kyung Lee.  I want to apologize.  My bladder is not

4   as strong as it used to be when I was younger, and that's

5   the reason I took a little break.

6        I just want to say one thing if you allow me to

7   put Mr. Schwartz on without any objection from this

8   audience.  I just need to tell you, the parties have been

9   working here very hard, in good faith to create a proposal

10  to, one, pay creditors, and two, to pay them in an equal

11  fashion.  I think those are really pretty legitimate

12  purposes of the Bankruptcy Code which I feel very good about

13  saying to you and to this entire group here, that I feel

14  very proud of being able to bring to this Court a process to

15  do that.

16       Yes, it may have some warts on it.  And yes, it's

17  not perfect.  But it's a proper purpose of this Court and to

18  this process in my view, for the 40 years I've been doing

19  this, to bring to this Court a structure that allows for

20  resolution of the bickering that's been going on for the

21  last ten years in which Mr. Schwartz and I have brought to

22  the table on Day 1 of a bankruptcy case $10 million to be

23  made available and for equal sharing of that money among

24  creditors, and yet I hear nothing, nothing but complaining

25  by those who actually want the money or who are entitled to

1    the money.

2            And so I say to you, Your Honor, there must be

3    something else going on for people to complain about that

4    when for ten years they've had nothing to be able to collect

5    on any of their judgments.  And I find that quite upsetting

6    on my part to have worked this hard to bring to the table

7    this kind of a structure and hear nothing but complaints

8    when the effort has been done solely to bring to the table a

9    structure that has fiduciaries watching over this process

10   for the next five years and bringing $10 million to the

11   table as a first offer on the table with the parties that

12   they believe caused all this injury.

13           And so with that said, Your Honor, if I may, I'd

14   like to be able to show this Court what we've done, why

15   we're here, and what we're trying to do.  And again, in a

16   non-adversarial fashion to try to present to you --

17           THE COURT:  I don't know if that's possible today,

18   Mr. Lee.

19           MR. LEE:  Again, I'm going to tone down my

20   rhetoric in my presentation.  But I didn't have a

21   presentation for you --

22           THE COURT:  Yeah.  If it's in the form of a

23   presentation, I have no problem with it.  If we're going to

24   -- the declaration isn't admitted into the record.  So

25   there's no evidence and there's no motion to go forward.  So

1   I don't need to take evidence about anything.  There's
2   nothing going forward today and there's nothing that Mr.
3   Schwartz -- I want to make sure he's clear about this --
4   that will be used in connection with support of any motion
5   that may or may not go forward today.  We don't have dates
6   on anything.  So if what Mr. Schwartz wants to do is provide
7   what typically happens in a Chapter 11 case, someone
8   provides background information about why we're here and
9   what you intend to accomplish, I've got no problem with
10  that.  I just want to make sure that everybody is really
11  clear, this is not going to serve as evidentiary in support
12  for any motion because there is no motion before the Court
13  today.
14           I will also tell everyone there is clearly -- and
15  I understand it -- a lot of emotion on both sides.  It's
16  completely justifiable, and I understand it.  My job is to
17  not focus on that.
18           MR. LEE:  Yes, Your Honor.
19           THE COURT:  My job is to rule on matters that are
20  before me, the legal issues that are before me.  There are
21  parties who are being referenced who are not here, but who
22  are certainly parties in interest.  They are party
23  contributors.  And I've got to consider that.  There are due
24  process issues that are being raised, there are motions that
25  sound like they're going to get filed.  And when we take

1   them up, I may rule on them based on the evidence that is

2   before me.

3          I think some of the concerns, Mr. Lee, are legit.

4          MR. WILLIAMS:  And I understand,  Your Honor.

5          THE COURT:  And there are legitimate concerns

6   about how we're here based on the papers.  Mr. Schwartz

7   wants to talk today.  Give him an opportunity to talk.

8          MR. RUFF:  Your Honor, I would actually object to

9   -- I don't know -- what is he going to inform the Court

10  about?

11         THE COURT:  Look, what I am anticipating -- and

12  Mr. Lee will have to (indiscernible) -- is kind of a generic

13  Chapter 11 presentation.  I have questions about these --

14         MR. RUFF:  Well, I have a lot of questions too,

15  Your Honor.  I think everybody in this room has a lot of

16  questions. But Mr. Schwartz is being put up as the chief

17  restructuring officer.

18         THE COURT:  No, he's not being put up for that

19  reason.  If he's going to stand -- if Mr. Schwartz wants, he

20  can stand here and tell me about background information

21  about the case.  This is not going to be used as testimony

22  in any way.  Because if that's the case, then Mr. Schwartz

23  better be ready for a lot of folks cross-examining him

24  today.  If this --

25         MR. RUFF:  Will there be an opportunity to ask

1    questions of Mr. Schwartz?

2              THE COURT:  If Mr. Schwartz is going to speak.

3    Mr. Schwartz can answer questions.

4              MR. LEE:  I have no problems with that, Your

5    Honor.  Mr. Schwartz is --

6              THE COURT:  That's what I'm saying.  If Mr.

7    Schwartz is going to -- just like every Chapter 11 case, if

8    there are questions of the person who stands up and provides

9    a presentation, folks get to ask questions.

10             MR. LEE:  We intend to run a transparent process,

11   Your Honor.

12             THE COURT:  I'm just saying this is not going to

13   be where Mr. Schwartz makes a statement and no one gets to

14   ask questions.  If Mr. Schwartz wants to make a statement,

15   people get to ask questions.

16             MR. RUFF:  I guess --

17             THE COURT:  I have questions.  And I'm going to

18   get my questions answered is what I'm saying.  And you may

19   like the questions I ask.

20             MR. RUFF:  I liked the questions that you asked

21   already, Your Honor, as I said at the outset.  And again,

22   this case begs many questions.  I just -- again, you are

23   here today for a specific purpose.

24             THE COURT:  I agree.

25             MR. RUFF:  We don't even know what these cases are

1    about now.  The Debtors admittedly, Mr. Oaken --

2              THE COURT: That's what I'm trying to find out.

3              MR. RUFF:  Well, okay, very well.  But whatever he

4    says today might be without any merit, because it might all

5    change is what I think we heard today.

6              THE COURT:  I guess that's what I'm saying.  Isn't

7    that something you would want to know?

8              MR. WILLIAMS:  No, Your Honor.  Until we have a

9    document that we know is --

10             THE COURT:  I'm not talking about the trust

11   agreement.  I'm talking about general background information

12   about who does IW help.  That's the question I have.  What

13   do they do?  Are they still conducting business activities?

14   He says no, but I'd like to hear it from him.  Are they

15   conducting commercial activities?  I'd like to know the

16   answer to that question.  Folks, I get to ask questions.  I

17   get it, you get a check, but I get to ask questions.

18             MR. WILLIAMS:  I have no problem with you asking

19   questions, Your Honor.  But with respect to the declaration

20   -- and I know it was offered as an exhibit -- it is part of

21   the record in all three of these cases, at least one

22   administered cases.  I would ask that the Court take

23   judicial notice of that declaration and make it part of any

24   record about what he is going to talk about.  Because I

25   think all your questions are actually answered in that

1    declaration.  And if he is going to say something different

2    today than what's in --

3         THE COURT:  You don't know that, because you don't

4    know the questions I'm going to ask, Mr. Williams.

5         MR. WILLIAMS: Well, he talks about bank accounts

6    and --

7         THE COURT:  You don't know what I'm going to ask,

8    Mr. Williams.

9         MR. WILLIAMS:  Yes, Your Honor.  I object to there

10   being any testimony today.

11        THE COURT:  There's no testimony.  Mr. Williams,

12   you've been part of a million Chapter 11 cases.  People get

13   to present information at the beginning, at the outset of a

14   case.  That's all -- and if Mr. Lee goes too far, I'm going

15   to shut it down.  It's really simple what's happening here.

16   In every Chapter 11 case, someone gets to make a

17   presentation and the Court gets to ask basic questions about

18   the Debtor.  Why are you here?  How did you get here?  Who

19   are these three entities?  What are they doing?  Why are we

20   in Victoria?  I get to ask a bunch of questions.  It sounds

21   like you would want to know some of the answers to some of

22   these questions.  Maybe there are questions you don't want

23   to know the answer to, but you get to ask questions.

24        MR. WILLIAMS:  Again, Your Honor, respectfully, I

25   have no problem with you asking any questions that you have

1    about anything related to this.  I do have a problem with

2    Mr. Schwartz making any presentation because this is not a

3    typical case.  These folks are victims, not creditors.  The

4    liability has been established.  The only issue is how much.

5    Mr. Lee wants to take credit for a document --

6              THE COURT:  I'm not doing any of that.

7              MR. WILLIAMS:  -- that's been (indiscernible) that

8    doesn't exist.

9              THE COURT:  Mr. Williams, I understand.  But you

10   have to -- you said you have no problem with me asking

11   questions.

12             MR. WILLIAMS:  No, Your Honor.

13             THE COURT:  Okay.  So, Mr. Schwartz, can I ask you

14   a few questions?

15             MR. SCHWARTZ:  Yes, Your Honor.  (indiscernible)

16   please?

17             THE COURT:  You can stand right there.  You can

18   take that microphone right there.

19             It sounds like you have a short presentation you'd

20   like to make.  What would you like to tell the Court?

21             MR. SCHWARTZ:  Well, (indiscernible).

22             THE COURT:  If you can just get the microphone a

23   little bit closer to you.

24             MR. SCHWARTZ:  What we're trying to do -- and I

25   got involved (indiscernible) in this process that

1    (indiscernible) the strategic plan, which (indiscernible).

2    But I was involved after that in a lot of the other matters.

3    But essentially to set up in a single location, a single

4    venue the claims -- the claims determination process, the

5    damage determinization process in a manner independent of

6    any influence by Mr. Jones or any of his associates and to

7    negotiate with Mr. Jones, which is what we did, creating the

8    fund, the initial fund is $9.8 million, to pay the claims

9    over a period of five years under the supervision of the

10    trust.  That's my legal description of what we're trying to

11    do.  The goal was to pay off other claims.

12            Mr. Jones also, as everyone has heard, put up

13    $725,000, and we'll continue dialogue with him.  I would

14    call it a negation (indiscernible) more serious money than

15    that, we need to put up $2 million.  And then I discovered a

16    royalty that was being paid to Mr. Jones that will have

17    documentation to support this.  The (indiscernible) that was

18    given to me was at some point in time IWHealth was the party

19    that generated or created that royalty and that Mr. Jones

20    for some reason at some point in time (indiscernible) paid

21    the royalty directly to Mr. Jones.  They got to have that

22    royalty back.  And he agreed to give us that.  And then also

23    we negotiated that $250,000 a quarter over five years to get

24    our total fund up to $9.8 million.

25            This was a negotiated process.  It was not Mr.

1    Jones telling us what he was going to do and us saying okay,

2    fine, we'll take that.  I had no idea who Mr. Jones was.  I

3    didn't even know until April 4th.  And Mr. Lee approached me

4    and I had to go find out who is this guy.  I had never heard

5    of him.  I hadn't heard of Infowars.  I was not very

6    interested in conspiracy theories.  (indiscernible) landing

7    on the moon, and I don't pay much attention to it.  So that

8    was the -- just of how we got here.

9              A little bit about the structure.  There are two

10   entities in the Jones business enterprise, two legal

11   entities that are responsible for all of the money

12   generation.  FSS, which is the marketing arm that reaches

13   out to his audience and sells everything from t-shirts to

14   vitamins and mineral supplements and emergency food

15   supplies, (indiscernible) that you could use.  Everything

16   you would expect, from books and whatever else.  That --

17   most of that inventory is supplied to FSS by a company

18   called PQPR.  And they are --

19             MR. LEE:  Let me interject.  There's an Exhibit 6,

20   if I may approach, Your Honor, that's already in the

21   binders.  It's corporate diagram that might help the

22   audience as well as the Court.

23             THE COURT:  Just refer to a docket.

24             MR. LEE:  It's Exhibit 6 in the witness's binder

25   book, Your Honor.

```
 1                THE COURT:  Okay, thank you.

 2           MR. SCHWARTZ:  And if you look at the PQPR

 3    (indiscernible) supplies most of the product, not all of it.

 4    Third-party vendors also supply the product, too.  But

 5    that's where the money comes from.

 6                As you know, or they know, Jones and his companies

 7    have been severely -- the word is they were cast out

 8    (indiscernible) or they have had problems (indiscernible)

 9    banks.  But any kind of service.  So they are very careful,

10    conscious, of trying to maintain their current vendors.

11                One of the concerns that came up, and we're

12    looking at this, was the question of filing the bankruptcy

13    is that that would probably push FSS over the top and it

14    would lose all of its or most of its vendor connections and

15    it could no longer survive.  In 2018 and 2019 -- I'm working

16    off memory here.  I'm 71 years old, so it doesn't always

17    work.  But there was something like -- FSS generally did

18    something like 76 to 79, almost $80 million of revenues in

19    those two years.  That's a significant amount of money.

20           MR. WILLIAMS:  Your Honor, if I could respectfully

21    -- we are hearing about entities that he is not CRO for and

22    that aren't debtors in this case.  And if we're going to

23    have a presentation about the debtors in this case, I don't

24    need to know what their strategy was about why Mr. Jones

25    elected not to file another --
```

1          THE COURT:  I have a question, Mr. Williams.

2   Thank you.  Please continue.

3          MR. SCHWARTZ:  Continue?  Okay, 76, 78 million

4   dollars of revenue from those two entities.  The -- if you

5   look at the impact of the litigation in 2021, I would

6   estimate (indiscernible) books be closed for 2021.  But

7   based on the merchant receipts from the credit card

8   operations, the revenue 2021 is approximately $56 million.

9   $20 million less than it had been in the past.

10         THE COURT:  So at some point over the last --

11  let's just call it -- you said you (indiscernible) around

12  April 4th.  So let's say sometime early this month.

13         MR. SCHWARTZ:  Yes.

14         THE COURT:  (indiscernible) with respect to the

15  three entities that are in bankruptcy today.

16         MR. SCHWARTZ:  Yes.

17         THE COURT:  So let's talk a little bit about that.

18  Can you just tell me a little bit about each -- your

19  understanding as to each entity that's in bankruptcy.  So

20  I'll start with the first one.  Infowars LLC.  It's InfoW

21  LLC, which was formerly known as Infowars.

22         MR. SCHWARTZ:  Correct.

23         THE COURT:  When did it change its name?

24         MR. SCHWARTZ:  It was changed in April.

25         THE COURT:  In April?  Do you remember when?

1          MR. SCHWARTZ:  No, I don't.

2          THE COURT:  Sometime before the filing?

3          MR. SCHWARTZ:  Oh, before the filing.  It was

4    shortly before the filing as I recall.

5          THE COURT:  Okay.  And --

6          MR. LEE:  And, Your Honor, if I may interject

7    here.  Part of the reason the name was changed --

8          THE COURT:  I don't want to get into the part of

9    the reason the name was -- I just want to understand.

10   Because at this point -- what does InfoW LLC do?

11         MR. SCHWARTZ:  InfoW LLC owns the trade name

12   Infowars.  Infowars is the name that FSS uses to market its

13   products, and that is the name that Alex's podcasts go out

14   under.  So it is the trademark.  It's the Coca-Cola for the

15   (indiscernible).

16         THE COURT:  I won't hold you to these numbers, but

17   just help me understand.  So let's just say within the 40

18   days before the filing, how much cash did -- or maybe on the

19   petition date, how much cash do you think InfoW holds?

20         MR. SCHWARTZ:  InfoW has no cash.  Up until the

21   time it was transferred to the trust, it was owned by Alex

22   as just part of his business operation.  I don't know why.

23         THE COURT:  What sources of revenues in the last

24   90 days?

25         MR. SCHWARTZ:  InfoW (indiscernible) he annualized

1   his revenue (indiscernible) for use of the trade name that

2   it owns.

3                THE COURT:  Okay.  Okay.  so let's turn to

4   IWHealth LLC.  Okay.  Let's just -- what does IWHealth LLC

5   do?

6                MR. SCHWARTZ:  IWHealth holds a royalty interest.

7   And it's referred to a royalty.  And what it is, it's a

8   commission that is paid by Youngevity to the Jones

9   enterprise for the sale of Youngevity products on the FSS.

10  But that royalty started in April, generally before the

11  filing.  It is now paid to IWHealth.  That was the amount I

12  said we discovered and I said has to come back here to --

13               THE COURT:  Do you know how much that amount was?

14               MR. SCHWARTZ:  About $38,000 a month.

15               THE COURT:  $38,000?

16               MR. SCHWARTZ:  A month.

17               THE COURT:  A month?

18               MR. SCHWARTZ:  Yes, sir.

19               THE COURT:  Is it currently receiving?

20               MR. SCHWARTZ:  Yes.

21               THE COURT:  And so I think you mentioned that FSS

22  sells in markets.  It's a non-debtor.  Does IWHealth sell

23  and market anything or does it just receive that royalty?

24               MR. SCHWARTZ:  It just receives that royalty.

25               THE COURT:  Okay, thank you.  Was it receiving any

1    royalty interest before?  Like let's just say with in the 90

2    days before the filing?

3           MR. SCHWARTZ:  Well...

4           THE COURT:  Go ahead.  I'll tell you why I'm

5    asking.  I don't want you to be confused by my question.

6    You mentioned that there was a direct pay at some point, and

7    then you stopped.  Or you stepped in and said no, it's got

8    to go directly to IW health, the royalty payment.  What was

9    the pre-bankruptcy arrangement before you...

10          MR. SCHWARTZ:  Pre-bankruptcy, the royalty was

11   sent to Alex Jones directly, his personal bank account.

12          THE COURT:  Okay, thank you.

13          MR. SCHWARTZ:  And I discovered that

14   (indiscernible) that was a Monday.  Because that's when I

15   went to Austin.  So prior to that date, it was not receiving

16   any royalty..

17          THE COURT:  Okay.  And then there's one more.

18   Prison Planet TV LLC.

19          MR. SCHWARTZ:  Prison Planet owns a number of

20   videos that were produced and developed by Alex Jones'

21   enterprise.  I think eight, 10, 12 or something like that.

22   There's a list of them.

23          THE COURT:  Aside from own them, what does it do?

24   It just owns them?

25          MR. SCHWARTZ:  It's similar to...

1          THE COURT:  InfoW?

2          MR. SCHWARTZ:  InfoW.  It just owns them.

3          THE COURT:  How much cash do you think it held on

4    the petition date?

5          MR. SCHWARTZ:  It held zero.

6          THE COURT:  It held zero.  Within the 90-day

7    period before the petition date, was it generating any

8    income?

9          MR. SCHWARTZ:  The 90 days before -- so just like

10   InfoW, owned by Alex Jones a hundred percent.  And half of

11   its assets were used (indiscernible) FSS.  It was not

12   anything for that use.

13         THE COURT:  Okay.  Okay.  I guess I can ask you

14   and I can ask Mr. Lee.  And I think Mr. Lee has already

15   asked the question.  What do you believe the purpose of

16   these Chapter 11 cases is?

17         MR. SCHWARTZ:  The purpose?  The purpose is to

18   arrange to pay all of the plaintiffs the amount of their --

19   let's say in a bankruptcy sense, their allowed claim in

20   full.  That's the purpose.

21         THE COURT:  So when the pleadings talk about

22   paying it in full, you are referring to a defined term in

23   the trust agreement that basically says whatever the court -

24   - whatever is allowed in the bankruptcy case, the amount of

25   that claim.

1          MR. SCHWARTZ:  Yes.

2          THE COURT:  Okay.  Does that contemplate payments

3   -- does the settlement then contemplate just the Debtors or

4   will it include a global settlement including the non-

5   debtors that you've described earlier?

6          MR. SCHWARTZ:  It includes the -- specially Alex

7   Jones and FSS.

8          THE COURT:  Okay.

9          MR. SCHWARTZ:  Because they are the source of the

10  funds to make the payment.

11         THE COURT:  Okay.  Mr. Schwartz, I will tell you,

12  there was a motion set for you for today.  It sounds like

13  it's not going forward.  I think those are all the questions

14  that I have for you.  I think that is what is customary on a

15  first day I think to just ask, get a general understanding.

16  Are you aware of anything else in connection with the

17  bankruptcy case itself that you think I should know at this

18  time in terms of what may be coming?

19         Typically -- and I'm just saying this for folks

20  who are listening.  It's very typical for a bankruptcy judge

21  to ask at the beginning of a case what might I expect in the

22  short-term future.  I've been told by some folks they are

23  going to file a motion, and I'll take them up.  And maybe

24  this is a question for Mr. Lee.  What may I expect in the

25  short near-term.

1          MR. SCHWARTZ:  Well, Your Honor, I'm not a lawyer,

2     as you know.

3          THE COURT:  No, no, no.  You're not.

4          MR. SCHWARTZ:  Mr. Lee (indiscernible) remand.

5     And that's coming I guess But I don't know -- I don't think

6     I'm qualified to talk about it.

7          THE COURT:  No, no, no.  I don't want you using

8     those words.  That's completely fine.  Thank you very much,

9     Mr. Schwartz.

10          MR. SCHWARTZ:  Thank you, Your Honor.

11          MR. RUFF:  Your Honor, could I just ask a couple

12     questions?

13          THE COURT:  Yeah, go ahead.  Just stand on the

14     other side.

15          MR. RUFF:  Yeah, I'll just (indiscernible) the

16     microphone is -- there we go.

17          Mr. Schwartz, I just have a question.  And it

18     relates to why we are here in Victoria.  And on the

19     petitions, there was an address listed for the Debtors where

20     they were located, 5606 North Navarro, Victoria, Texas.  Are

21     you familiar with that location?

22          MR. SCHWARTZ:  Yes, I am.

23          MR. RUFF:  Okay.  And do the Debtors have a lease

24     of that space?  Is that what your understanding is?

25          MR. SCHWARTZ:  Well, it's executive suites.  We

1   have two offices there.  I guess that's some form of a

2   lease.

3            MR. RUFF:  Okay.  So who sits in those office?

4            MR. SCHWARTZ:  There's one desk and one chair and

5   one desk and one chair.  So that's...

6            MR. RUFF:  Do you know when those leases were

7   entered into?

8            MR. SCHWARTZ:  Early April I think.

9            MR. RUFF:  So prior to that, prior to early April,

10  they weren't located there?

11           MR. SCHWARTZ:  No.

12           MR. RUFF:  Okay.  Now, the petition that was

13  signed under penalty of perjury I believe says that for the

14  greater part of 180 days, the debtors were located at that –

15  –

16           MR. LEE:  Objection, Your Honor.  This is asking

17  for a legal answer.  And if you want to talk about that, we

18  can talk about that.

19           THE COURT:  Yeah.  I think that's probably --

20  well, it's a question.  I think the trustee -- I think maybe

21  Mr. Schwartz probably -- you know, like with the remand,

22  maybe someone else can answer --

23           MR. RUFF:  I won't ask for a legal conclusion,

24  Your Honor.  I just want to make sure it's clear though that

25  it wasn't the greater part of 180 days that the Debtors were

1    located there.

2              MR. LEE:  That's not an accurate question, Your

3    Honor.  (indiscernible) Dallas, Judge Hale, these Debtors

4    had domicile in every location in the state of Texas for 180

5    days.  So we can have an argument about that --

6              THE COURT:  But we're not going to have it today.

7    What we're going to have is argument (indiscernible) motion

8    in front of the Court that the Court will then consider.

9    Today we're just going to ask very --

10             MR. RUFF:  Your Honor, I was just asking the

11   question to figure out -- to get an idea of why we are here

12   in Victoria.

13             THE COURT:  You can ask questions and people can

14   answer or not.

15             MR. RUFF:  Do you have any idea -- so you had

16   mentioned that Mr. Jones is the one who is going to be

17   filing -- excuse me, funding this process.

18             MR. SCHWARTZ:  Mr. Jones and FSS.  Most of the

19   money come from -- of the $9.8, most of it will come from

20   FSS.

21             MR. RUFF:  Okay.  Ans is it your understanding

22   that both of those entities are also liable for the same

23   body of claims that we are here to try and deal with?

24             MR. SCHWARTZ:  Well, I must admit, I've not looked

25   at the petitions and complaints in the underlying cases.  I

1   would be shocked if they were not.  That's where the money

2   is at.

3            MR. RUFF:  Okay.  Any idea -- and again, only if

4   you actually know or whatever.  But any idea or any

5   discussions as to why Mr. Jones didn't file for bankruptcy?

6            MR. SCHWARTZ:  Yes.

7            MR. RUFF:  Okay.  Do you know why?  What was

8   discussed as to why he didn't file for bankruptcy?

9            MR. SCHWARTZ:  I know the discussions because I

10  was involved in some of them.  The discussions was, you

11  know, Infowars is a prominent trademark in the conspiracy

12  theories community, if you will.  Alex Jones' name is

13  equally as prominent.  And so the concern was

14  (indiscernible) FSS, FSS were concerned about losing

15  lenders.  In Alex Jones' case, that it would somehow ruin --

16  harm this trademark, his name and his ability to generate

17  funds, sell merchandise to these people.

18           MR. RUFF:  So that's what was expressed to you at

19  least?

20           MR. SCHWARTZ:  That was what we discussed.

21           MR. RUFF:  And does that make sense to you, that

22  that would -- I mean, he is funding this.  the claims are

23  against him.  Does it make sense that somehow him being part

24  of a bankruptcy process that is open and transparent -- how

25  does that harm him?

1              MR. SCHWARTZ:  Being put into bankruptcy is what

2       we were concerned about.  By putting him in bankruptcy would

3       harm his trademark value, his value to us and generally

4       cashflow.  That was the reason as I understood it.  And that

5       was the reason I was involved in discussing it.

6              MR. RUFF:  Well, why didn't it harm the debtors

7       that actually filed then?  They own intellectual property,

8       don't they?

9              MR. SCHWARTZ:  They own intellectual property, but

10      they are not in the public eye at all.  I don't think anyone

11      knew who InfoW was or Infowars LLC was.  I would assume, and

12      I think a lot of people did, that that was a significant

13      entity other than the ownership of the trade name, which is

14      significant.  That was all the significance to the business

15      operation (indiscernible).

16             MR. RUFF:  Now, you had mentioned that when you

17      were negotiating -- for example, you had mentioned that you

18      said that when you discovered about those royalties, hey,

19      those have to become and be paid directly to -- I forget who

20      it was.  I think IWHealth?

21             MR. SCHWARTZ:  Yes.

22             MR. RUFF:  Okay.  And when were those negotiations

23      taking place approximately?

24             MR. SCHWARTZ:  Well, they started on the first

25      Monday I was in Austin, right after the April 4th meeting

1    with Mr. Lee.  They probably, you know, went for four or

2    five days (indiscernible) for transferring the

3    (indiscernible) sending money to the trust, we've got to get

4    bank account (indiscernible) for the trust.

5            MR. RUFF:  Okay.

6            MR. SCHWARTZ:  Because the trust was going to own

7    InfoHealth.  That's what -- the decision was made to put it

8    (indiscernible).

9            MR. RUFF:  Okay.  And were you engaged as the

10   chief restructuring officer at that point?

11           MR. SCHWARTZ:  I don't think so.  I think I was

12   engaged on the 8th or 9th of April.  I could have been.  It

13   was very close to that date.

14           MR. RUFF:  Okay.  So the agreement, the trust

15   agreement that you said that you were negotiating, you were

16   not really negotiating on behalf of nay party, were you?

17           MR. SCHWARTZ:  No.  Each party had a lawyer there.

18   I guess the trust didn't.  But I was the CRO.  I guess I was

19   negotiating for the Debtors, because that's who my

20   responsibility was to.

21           MR. RUFF:  Is it more accurate to say you were the

22   proposed CRO at that point?

23           MR. SCHWARTZ:  Correct.  I was proposed CRO.

24           MR. RUFF:  Okay.  So do you think maybe perhaps it

25   was more accurate to say that you were giving advice as to

1   how it would be better set up optically?

2         MR. SCHWARTZ:  No.  I was not giving advice on

3   (indiscernible).  They wanted me to be CRO.  I've got a

4   reputation -- I've been in this business for over 40 years.

5   And I've done all kinds of stuff.  I worked as a

6   (indiscernible) receiver.  I've been special

7   (indiscernible).  I've got a reputation.  They came to me

8   and they wanted my reputation.  You want my reputation.

9   That's one of the things (indiscernible) everything to be

10  clear.  If this money does not belong to Alex, shouldn't be

11  going to Alex, (indiscernible) over here.  So I didn't put

12  it in those words, and I didn't have to.

13        MR. RUFF:  Sure.  So it's accurate to say that if

14  you were going to be a part of this, this is how you wanted

15  it to be done.

16        MR. SCHWARTZ:  I wanted it to be clear, clean, as

17  see-through, and I wanted it to be right.  I wanted as much

18  money getting into the pot.  I'm not think that this was

19  being negotiated.  I'm thinking this is going to be hard to

20  do with $725,000 and $40,000 a month royalty.

21        MR. RUFF:  Right.  So I guess my question then is

22  your negotiation was more on behalf of yourself and, hey, if

23  I'm going to be invested in this, this is how I want it to

24  be.

25        MR. SCHWARTZ:  No.  At that point in time, my

1    objective was to get as much money on the table you can get

2    for the benefit of claimants, the claimants.  That was our

3    job.  Okay?  If they wanted me here, then they had let me do

4    my job.  And that would continue to be the case.  You know,

5    can we get more money on the table is the question I have.

6           MR. RUFF:  Okay.  But again, that was your job

7    that you were looking perhaps to do.  At that point you had

8    not been engaged, correct?

9           MR. SCHWARTZ:  Correct.  I had not been engaged.

10          MR. RUFF:  Okay.  So Mr. Jones and presumably some

11   of his professionals were looking to have you engaged in

12   this process at this time.  Is that correct?

13          MR. SCHWARTZ:  Well, and they were definitely

14   considering engaging me because I went to their office and

15   they held nothing back from me that I asked f

16          MR. RUFF:  And at that time, they were propping to

17   you this structure.  Is that acute?

18          MR. SCHWARTZ:  Yes.  They were working on the

19   structure.  But the framework was...

20          MR. RUFF:  Did they have a draft of trust

21   agreement, for example, for you to look at?

22          MR. SCHWARTZ:  I don't recall when I first saw

23   that.

24          MR. RUFF:  was it discussed do you believe?

25          MR. SCHWARTZ:  In general, the trust agreement.

1           MR. RUFF:  Okay.

2           MR. SCHWARTZ:  I knew there was on coming.  I knew

3    who the proposed trustees were.

4           MR. RUFF:  If -- and that a big if -- if these

5    cases are to go forward, do you think the Debtor or you as

6    the chief restructuring officer of the Debtors would have

7    any opposition to a committee being appointed in these

8    cases?

9           MR. SCHWARTZ:  I mean, whatever the Court wants.

10   I want this thing -- my goal when I walk off this thing five

11   years from now that nobody can question what I did.  And if

12   someone wants to have a committee, they'll have a committee.

13   I mean, that's not for me to say.  But I don't have a

14   problem with it.

15          MR. RUFF:  All right.  Thank you, Mr. Schwartz.

16          THE COURT:  Thank you.

17          Mr. Lee, let me just ask you.  We're not going

18   forward today.  Thank you very much, Mr. Schwartz.

19          MR. LEE:  That's correct.

20          THE COURT:  So you agree with Mr. Williams that I

21   think it's premature to set a date on a timing for the

22   motion, call it the trustee motion, until there is some --

23   until the document stops moving.  And then somebody can

24   refile the --

25          MR. LEE:  I disagree -- I apologize.

1          THE COURT:  No, I get it.  But I'm just telling

2     you.  Because you're asking for this (indiscernible) relief,

3     right?  And this is different than -- maybe you refile

4     something and maybe the date gets set.  But as of right now,

5     I don't know what version of that document is going to look

6     like based upon the statements that Mr. Okin made.  So this

7     isn't a DIP that's going to get tweaked or a disclosure

8     statement where additional sentences are going to get added

9     based upon objections and you kind of negotiate it up.  This

10    is a trust agreement that, I don't know, could materially

11    change.  Mr. Battaglia tells me it won't or he doesn't

12    anticipate it, but I don't know.  Maybe we set a status

13    conference in a week and then we'll know more.

14          MR. LEE:  Your Honor, I fully support that.  And

15    let me just add to this that --

16          THE COURT:  Let me get this additional thought

17    out.

18          MR. LEE:  Yes, sir.

19          THE COURT:  At that status conference, you're

20    going to have to help me understand why at a minimum InfoW

21    and Prison Planet are Subchapter V debtors.  We haven't

22    taken any evidence today.  But based upon what I've heard --

23    so I'm not ruling on it.  You're going to have to help  me

24    understand.

25          MR. LEE:  Yes, Your Honor.

```
 1              THE COURT:  And I want to make sure that everybody
 2     understands why I'm asking these questions.  And it's based
 3     entirely on the statutory provisions.  Section 1182 of the
 4     Bankruptcy Code defines a Debtor as a person that engaged in
 5     commercial or business activity.  Person is defined in
 6     Section 101(41) of the Bankruptcy Code and includes
 7     individuals, partnerships, or corporations.  So person
 8     directly is satisfied, but commercial or business activity,
 9     I don't hear any.  (indiscernible) comes to those two.  And
10     today is not the day to take it up.  I just want everybody
11     to give it some thought based on what I heard.  I think
12     IWHealth -- and again, I didn't take any evidence.  But I
13     did hear Mr. Schwartz say that at least there is a royalty
14     of some amount coming in every month, which I think puts
15     that entity in a different bucket than the other two that I
16     heard.  And again, this is just preliminary discussions that
17     I've heard.  And I'm putting this in the what kind of case
18     do we have as I ask the questions about third-party funding,
19     you know, the ability for them to cut off the lifeline of a
20     case at any point, the role of the trustees and who they
21     would serve, the role of a CRO, whether a true fiduciary of
22     the estate or working for a trust that has not -- that may
23     not have the best interest of the estate.  And it may or may
24     not, but I think at a minimum I need to understand from a
25     foundational standpoint what chapter these cases should be
```

1    in.

2            It sounds like other motions are going to get

3    filed, and I'm not here to prejudice or encourage one way or

4    the other what people are going to file.  People will file

5    whatever they file, and we take them up in due course.  But

6    based upon what I heard, I think we've got -- I've got to

7    answer that question pretty quickly, and I think it can be

8    done in short order I suspect.

9            Mr. Lee?

10           MR. LEE:  Yes, Your Honor.

11           THE COURT:  Now I'm going to stay quiet.

12           MR. LEE:  Number one, with respect to the question

13   that you've asked about the two other entities, I can give

14   you the answer today, but I am prepared to answer at the

15   status conference, and we'll present whatever you want that

16   we think satisfies the business rule that you are asking

17   about insofar as these two Debtor entities, and we are happy

18   to do that.

19           THE COURT:  Okay.

20           MR. LEE:  Number two, whatever they want to file,

21   please file.  Number three, in our way of thinking about

22   this issue, Your Honor, there's only so much a Debtor can do

23   pre-petition to negotiate with third parties.  Like in a

24   DIP, as you all know.  We've brought what is best -- what we

25   could do with third parties.  We are asking now for the

1   creditors, the U.S. Trustee, and for you to help us finish

2   those negotiations.  Because we don't have the balance of

3   the leverage of negotiations with FSS and Alex Jones.  And

4   that's why we are here.  And so if the parties want to do

5   that, they should do that.  And we encourage that.  We've

6   told everybody that.  But for people to just nick pick at

7   this thing and to say it's not appropriate, et cetera,

8   they're fine.  They can do that.  But I want the Court and

9   everyone to know that there is a good faith effort being

10  made here to try to do something constructive with the

11  bankruptcy process.  And you're right, it's not perfect.

12  It's not the panacea of all things.  But it is a construct

13  devised to bring together the parties to a resolution of a

14  very sad and complex situation.  And just like the Boy

15  Scouts, just like the Catholic Diocese, just like any other

16  situation where litigation is at hand, the Bankruptcy Code

17  and the courts are the appropriate vehicles to do this.  And

18  we've picked one because we think it's a resolution process

19  that makes sense here.  And because, unlike the Boy Scouts,

20  unlike Catholic Diocese, there are not millions of dollars

21  available here.  There are limited funds, and we are trying

22  to maximize it so that it goes to the Claimants.  And that's

23  part of the reason why we chose Subchapter V, because not

24  only are we qualified to do that, but it's the right vehicle

25  under the Bankruptcy Code to do this.  And that's why we are

1  here.

2       And again, these are arguments, nothing more than

3  arguments.  And we'll come to you at the appropriate time to

4  make these as actual fact and proof.  But we'll be here on

5  the status conference when you want us to.  I'm going to

6  push the parties to get this trust document done.  And I

7  will tell you, I disagree with Mr. Williams and I disagree

8  with the other parties wanting to delay this thing.  Because

9  we only have 120 days to get this case done in my view.  The

10  trust document is what it is.  It will get fixed to the

11  point where I think you will get comfortable with it.  The

12  two jurists aren't going to sit on something were either

13  they have been misled or not appropriate.

14       And for people to suggest that you're going to be

15  snookered by something like this I think is inappropriate.

16  The parties are going to act right on this side of the

17  table, and we're going to do our very best to make sure the

18  process is correct, that it's upright, and that it's in good

19  faith.  And I will be here to present all of that to you

20  next Friday, and I'm going to push the parties to get the

21  trust document done and to fix the PSA as you pointed out

22  and the things that you've said so far.  And we'll proceed

23  as --

24       THE COURT:  Wait a minute.  I'm not approving the

25  PSA.  So (indiscernible).

1          MR. LEE:  I'm a little overly-ambitious today,

2     Your Honor.  And I apologize for that.  But we will be here

3     Friday to take care of whatever you --

4          THE COURT:  I want -- there's a lot of folks here

5     I courtroom and a lot of folks on the phone saying they are

6     going to file things.  And once they're filed, we'll take a

7     look at them and we'll take them up.  I am making no ruling

8     today on the two matters that were set, the CRO motion and

9     the trustee motion.  I very much appreciate all the comments

10    made by the parties.  I very much appreciate the statements

11    made by Mr. Schwartz.  I know more than I did before I got

12    on.  And if parties file things, then we'll take them up.

13    Everybody knows here in Southern District, reach out to my

14    case manager and just let me know something got filed.  You

15    know, I'll set a hearing on it.

16          Why don't we set a status conference?  And status

17    conference, again, I don't know if it's going to be an

18    evidentiary hearing.  It might just -- but everybody is

19    going to get plenty of notice before any witness is filed.

20    I can carry any witness and exhibit list that got filed.  If

21    parties want to supplement it based upon something they may

22    or may not see, they certainly have the right to do so.  But

23    I'm not going to -- you know, if you filed something today

24    and you feel like it's good, it will carry whenever

25    something gets heard, probably should take comfort in that.

1           You know, would Friday the 29th, do you think we
2    could hold it -- would 3:00 work for the parties?
3           MR. LEE:  For the Debtors it does, Your Honor.
4           THE COURT:  Okay.
5           MR. LEE:  I'm sorry, Your Honor.  Did you say the
6    29th?
7           THE COURT:  Yes.  That's next Friday I believe.
8    Yeah.
9           MR. OKIN:  Your Honor, if the goal was to have the
10   trust document done and available to parties with time to
11   read it, could I suggest we push it to Monday?
12          THE COURT:  Well, the reason I am not pushing it
13   until that following Monday is I would like to stop and just
14   see where things are.  And maybe at that point -- I don't --
15   there's going to be a lot of moving pieces over the next
16   week, and I want to just stop there, even if it's just to
17   check in.  It could be a ten-minute hearing.  It could be
18   more.  But I want to check in at that point and I want to
19   put the pressure on the parties, which means that some young
20   associate is going to be working all weekend.  And all I can
21   say is I've been there.
22          MR. LEE:  Your Honor, if I may ask, are there any
23   specific issues you would like for us to be in a position to
24   address for you at that status conference next Friday?
25          THE COURT:  The only things that are before me are

1    the two motions.  And I've got to check in to see where that

2    is and when the parties wish to go forward on that.  And if

3    something else gets filed, then we can talk scheduling on

4    that.  But at least it's a good place, we don't lose much

5    time on this.

6          Does anyone else have anything they wish to say at

7    this time?

8          MR. WALSTON:  Your Honor, Cliff Walston on behalf

9    of the Texas plaintiffs.

10         THE COURT:  Yes, sir.

11         MR. WALSTON:  The only other data point I would

12   like to add is I do believe as to what is coming, the Texas

13   plaintiffs intend to immediately file a motion to lift the

14   stay before Your Honor and a motion to remand the trial

15   court proceedings back to the state court.  In particular,

16   the trial that was supposed to start on Monday.  And I think

17   that it's important to --

18         THE COURT:  But can you just -- something -- I

19   don't know -- I heard the word remand.  I have not heard the

20   word removed.

21         MR. WALSTON:  Yes, Your Honor.

22         THE COURT:  I don't know what the status of that

23   litigation is and where it is.  Maybe you can help me with

24   that.

25         MR. WALSTON:  Sure.  I'll help you.  I'd love to

1    fill you in on the details of that.

2              As we all know, Mr. Lee filed this plan in the wee

3    hours of Monday morning.  At 9:30 Monday morning of this

4    week, the plaintiffs in that lawsuit non-suited Infowars

5    LLC.

6              THE COURT:  Okay.

7              MR. WALSTON:  Infowars LLC was the only debtor

8    that was a defendant in that case.  The other two debtors

9    are not parties to that case.  Then after at 3:30 p.m., even

10   though by operation of law, Infowars LLC was no longer a

11   party to that litigation because the notice of non-suit had

12   been filed and under state law becomes effective upon

13   filing, Infowars nevertheless removed that case to the

14   Western District in Austin because that case was set to

15   proceed in Austin.  And they had a pretrial hearing on

16   Wednesday of this week previously scheduled to handle all

17   pretrial matters in addition.  The court there had requested

18   an especially large jury pool of extra jurors to show up on

19   Monday.

20             And so ultimately after a contested hearing on

21   Wednesday about whether that removal was proper, even though

22   at the time of removal Infowars was not a party to that

23   case, the court ultimately decided there in the trial court

24   that the plaintiffs needed to go to the court of -- to the

25   Austin bankruptcy court, Western District Bankruptcy Court,

1    seek remand of that trial court back to her.  And she

2    informed all of the parties that the very first possible day

3    after that case hits back and she is able to get a hundred

4    jurors in that courtroom, that they were going to start

5    trial.

6              THE COURT:  So that's the question.  You kind of

7    got to it. So it's not before me.

8              MR. WALSTON:  It is not before you.  The motion to

9    lift --

10             THE COURT:  (indiscernible).

11             MR. WALSTON:  You said what is going to be filed.

12             THE COURT:  No, I appreciate it.

13             MR. WALSTON:  None of the cases -- so there were

14   three cases for the Texas plaintiffs set back to back to

15   back.  The first was supposed to start on Monday.  The

16   second one was June, I believe.  And the third one is set

17   for August, I believe.  So all three of those cases were

18   removed to the Western District as a part of this filing.

19             What is before you though is in the second and

20   third of those cases, Infowars LLC is still a defendant in

21   those cases.  So we will be seeking to lift the stay as to

22   those two, to then go to the Western District to seek remand

23   of those two cases, what I'm going to call the June and

24   August trials.

25             THE COURT:  Got it.

1        MR. WALSTON:  But the reason why I raise these

2   issues is because those trials aren't just about liquidating

3   the damages, liquidating these claims.  And I actually

4   applaud Mr. Lee for trying to come up with a creative

5   structure to put some money on the table for the Claimants.

6   But those trials will actually determine the nature of those

7   claims and likelihood.  And here's why.

8        The Austin court had already entered a liability

9   finding against Mr. Jones with three key issues.  The first

10  was that he was liable for defamation.  The second was that

11  he did that with actual malice, which includes an intent to

12  harm element.  And the third was a finding that all of Mr.

13  Jones' entities, including Infowars, Free Speech Systems,

14  and Mr. Jones himself, were all alter egos of each other.

15       And so had that case gone to trial and there had

16  been the liability finding had become final and that claim

17  had been liquidated in terms of an actual dollar amount,

18  there is a very high likelihood that as to Alex Jones

19  individually, that would not have been a dischargeable debt

20  under 523 because it was a damage award against him for an

21  intentional tort in harming these families.

22       THE COURT:  But I guess --

23       MR. WALSTON:  And so it's the nature of the claim

24  as well, not just the amount.

25       THE COURT:  No, I understand that.  I guess but

1    procedurally what's coming our way is a motion to lift stay

2    to --

3              MR. WALSTON:  Two of the three.

4              THE COURT:  Two of the three to allow you to seek

5    remand.

6              MR. WALSTON:  Correct.

7              THE COURT:  In the Western District.

8              MR. WALSTON:  We don't believe we need to seek

9    your lifting the stay as to the one case in which

10   (indiscernible).  Correct.

11             THE COURT:  Okay.  I just want to make sure

12   procedurally I understood why you were using the word

13   remand.

14             MR. WALSTON:  Yes.

15             THE COURT:  You weren't asking me to remand

16   anything.  It's in the Western District.  I just wanted to

17   understand where they were.

18             MR. WALSTON:  Correct.

19             THE COURT:  Okay, thank you.

20             MR. WALSTON:  And the other aspect of this too,

21   Your Honor, as we learned from Mr. Schwartz as to the type

22   of money that was generated by Alex Jones and his entities.

23   You know, each year we heard $80 million, we heard it's down

24   to $50 million.  So the practical reality for these

25   creditors isn't just a dollar amount.  Mr. Jones, since 2012

1    when this tragedy happened, has apparently generated in

2    excess of half a billion dollars of revenue with his

3    bullhorn.  That's how he makes his money.  He sells these

4    products because he has an audience of millions and millions

5    of people and he has a very, very loud bullhorn with which

6    to do it.

7              These individual families don't have that kind of

8    platform.  They do in the courtroom.  And these cases are

9    every bit as much about having a determination finally made

10   for them, them having their day in court in which Mr. Jones

11   is held accountable for his conduct.  So it's not just about

12   a liquidating claims procedure, it is very emotional.  And

13   that's why there are so many people in this courtroom and

14   stuff.

15             THE COURT:  Yeah.

16             MR. WALSTON:  So those cases are very important to

17   go forward, not just from a claims perspective and what that

18   claim really is, and is that claim even dischargeable, but

19   it's also about them having their day in court and the

20   emotional aspect that comes with that and their right as a

21   plaintiff to have their claims heard by a jury of their

22   peers.

23             THE COURT:  If you file the motion, we'll consider

24   it.

25             MR. WALSTON:  Thank you.

```
 1            THE COURT:  Thank you.
 2            MR. LEE:  Your Honor, just one observation to show
 3    the power of the bankruptcy system.  As soon as we filed,
 4    they non-suited us.  So it was (indiscernible) Infowars.  I
 5    just want you to know that.
 6            THE COURT:  Is there anything else procedurally I
 7    should know about before we -- is there anyone on the line
 8    who wishes to address the court?  Hit five-star.  I didn't
 9    mean to neglect anyone who wishes to address the Court.
10    Okay.  All right.
11            I thank everyone today for their participation.  I
12    would let everyone know for those of you who are
13    participating by video and by phone, as you can tell, my
14    dial-in number and the GoToMeeting link is on there.  It is
15    available at any time for me.  So if there is another
16    hearing set, it sounds like Next Friday at 3:00 p.m., it's
17    going to be the same dial-in and the same GoToMeeting link
18    for all cases that are before me.  So it's just not -- it's
19    a feature that I'm very proud of that we have here in the
20    Southern District of Texas.  Feel free to participate, free
21    to listen in.  And I thank you very much for your time and
22    your participation.  I thank each of the parties for their
23    time, and I will see everyone next Friday at 3:00 p.m.
24    Thank you.
25            (Proceedings adjourned at 10:49 a.m.)
```

```
 1                        CERTIFICATION

 2

 3      I certify that the foregoing is a correct transcript from

 4      the electronic sound recording of the proceedings in the

 5      above-entitled matter.

 6

 7

 8

 9

10      Sonya Ledanski Hyde

11

12

13

14

15

16

17

18

19

20      Veritext Legal Solutions

21      330 Old Country Road

22      Suite 300

23      Mineola, NY 11501

24

25      Date:  April 27, 2022
```